448 P.2d 243

**STATE of Idaho, Plaintiff-Respondent,**

v.

**LaVar CHAFFIN, Defendant-Appellant.**

**No. 10128.**

Supreme Court of Idaho.
Dec. 2, 1968.

---

Whittier & McDougall, Pocatello, for defendant-appellant.

Allan G. Shepard, Atty. Gen., and Roger B. Wright, Deputy Atty. Gen., Boise, Dean Williams, then Pros. Atty., Bingham County, Blackfoot, for plaintiff-respondent.

McQUADE, Justice.

On May 2, 1966, appellant LaVar Chaffin was convicted of the crime of involuntary manslaughter and sentenced to serve an indeterminate term not to exceed five years in the Idaho State Penitentiary.

The evidence produced at the trial before a jury established the following facts. For some time prior to August 8, 1965, LaVar Chaffin and his wife, Carol, the victim of the shooting in this case, had been separated. During the week before the shooting they apparently came together again in order to attempt a reconciliation, despite the fact that Carol Chaffin on August 9, 1965, filed a complaint for divorce against her husband. Numerous witnesses testified without contradiction that on August 10, 1965, appellant and his wife went on a fishing trip to Dell, Montana, and returned to their apartment at 245 Northwest Main Street in Blackfoot, Idaho, on the morning of Friday, August 13, 1965.

At 11:00 a. m. on the day of the shooting, August 15, 1965, LaVar Chaffin visited the apartment of one Carol Whiting in order to contact one Doyle Grimmett about going hunting later that day. After a few minutes, Chaffin left with Carol Whiting and dropped her off at her place of employment, which was on the way to Chaffin's apartment. Grimmett and one Phillip Dance followed Chaffin to his apartment with a small box of Chaffin's clothing from Carol Whiting's apartment. There was testimony that Chaffin had been going with Carol Whiting during his separation from his wife.

At the Chaffin apartment, LaVar Chaffin, his wife, Grimmett and Dance talked and had a beer during the fifteen minutes they were there. The Chaffins were parents of a baby boy who had been taken earlier that morning to Shelley, Idaho, by appellant's mother. The four of them then went to Grimmett's sister's house for forty-five minutes to repair a car, during which time Carol Chaffin remained in the car in which they had arrived. They drove back to the Chaffin apartment and let LaVar Chaffin out to wait for his mother to return the child, while Carol Chaffin, Grimmett and Dance made an unsuccessful trip to the Silver Spur Bar for more beer. Having returned to pick up LaVar Chaffin, all four then went to a so-called Bartender's Picnic at which all apparently were welcome because the men had worked part-time at the Darby Club in Blackfoot. All of them drank beer at the picnic.

Just before 3:00 p. m. the four returned to the Chaffin apartment. Grimmett lay down on a bed in a bedroom and went into a very deep sleep from which he was awakened only by the vigorous shaking of Detective Merritt after the shooting had occurred. When Dance left the apartment, saying he would return to go hunting but not intending to do so, Carol Chaffin was looking in the rear portion of the apartment for shotgun shells to take hunting and appellant was in the living room at the front of the apartment. There was testimony that appellant and his wife were yelling at each other at this time.

The landlady at the New Tourist Hotel lived in the apartment next to Carol and LaVar Chaffin's apartment. She testified that at about 3:00 p. m. she heard the Chaffin screen door slam and went to her window to look out on the street. She saw that appellant had just opened the door of his pickup truck and was doing something there. The landlady testified that she turned around and took about ten steps to her kitchen when the shot rang out. Momentarily appellant came to her apartment to call an ambulance. An upstairs resident of the hotel heard the shot, came down, and met appellant, who took him to his apartment. The body of Carol Chaffin was seated in an overstuffed armchair (against the wall of the small living room) nearly opposite the front door of the apartment.

Officer Shiosaki responded to a radio call at 3:15 p. m. and was dispatched to the Chaffin apartment. Chaffin wanted to take his wife to the hospital in the patrol car but was told to wait for the ambulance. Carol Chaffin appeared to be dead at that time and was pronounced dead upon arrival at the hospital.

Police officers requested that Chaffin make a report on the facts of the shooting at a time when he was neither under arrest nor charged with any crime. Detective Merritt and Chief Wrenn testified as to Chaffin's statement. Chaffin told them that after Dance left, he got out the sixteen gauge shotgun and sat on the couch which was next to the chair in which his wife was sitting. He said he turned the gun upside down on his lap and began putting shells into the magazine. When he had filled it, he jacked the action back and it went off. The contents of the shell hit his wife in the face as she sat in a normally erect position in the chair.

Because of certain inconsistencies the police believed they had found, LaVar Chaffin was later charged with first degree murder. The State attempted to show that it would have been impossible for Chaffin to return to the couch from his pickup truck outside and begin loading the shotgun in the short interval between the time when the landlady saw him at his truck and the time she heard the shot. The State also showed by means of hypothetical questions that if the shooting had occurred as Chaffin described it, then the trajectory of the missiles within the victim's head would have been on an upward path, while in fact the x-rays showed that they traveled a downward path. Moreover, a gunsmith testified that the trigger mechanism of the shotgun was in no way defective. At the close of the State's case, however, the court granted appellant's motion for a directed verdict of acquittal on the first degree murder

charge. The jury then found appellant guilty of involuntary manslaughter.

■ Appellant makes numerous assignments of error, which will be somewhat consolidated for purposes of this opinion. Appellant first contends that the court erred in allowing two of the State's witnesses, Chief Charles Wrenn and Dr. Maurice Heneger, to testify in answer to a hypothetical question as to the bullet's probable trajectory. This Court has set out certain requirements for the use of hypothetical questions in a number of cases.[1] A hypothetical question must be fairly framed to reflect facts which are admitted or proved. It must assume all the facts which are material to the proposition intended to be established by the answer. The facts assumed must tend to be shown by the evidence, but the jury may accept or reject those facts and therefore may still accept or reject the answer to the hypothetical question. The ultimate test for the validity of a hypothetical question as to both form and content is fairness, a matter largely for the trial court's sound discretion.

■ Judged by this standard, the question propounded to both Chief Wrenn and Dr. Heneger was not objectionable. The question was substantially as follows:

"* * * from this set of facts a person the size you see the defendant to be is in a seated position on a sofa loading a 16 gauge shotgun which is in his hands across his knees, he's inserting shells in the gun and jacks the gun, the gun discharges and strikes a person seated in a reclining style overstuffed chair with arms, which chair is in an upright position, the chair is 14 inches from the floor to the top of the seat cushion, the person seated in the chair is seated in an upright position and is from the crest of her * * * hip * * * to her mouth one foot six and a half inches

1. Hancock v. Halliday, 70 Idaho 446 at 449–450, 220 P.2d 384 at 386 (1950); Willis v. Western Hospital Association, 67 Idaho 435, 182 P.2d 950 (1947);

Evans v. Cavanagh, 58 Idaho 324, 73 P.2d 83 (1937); Cochran v. Gritman, 34 Idaho 654 at 675, 203 P. 289 at 296 (1921).

tall and the depth of the thigh is seven inches, with this set of facts what would have been the angle of penetration of the pellets from the lap in the person who is seated in the chair?"

To this question both Chief Wrenn and Dr. Heneger answered that the trajectory of the pellets would have been on an upward angle. Appellant contends that this question either omits material facts or assumes facts not tended to be shown by the evidence. Appellant argues that there was no evidence to show the position of Carol Chaffin's body when the shell struck her. However, Chief Wrenn did testify that LaVar Chaffin said, in his description of the shooting, that his wife was sitting erectly in the chair just the way Chief Wrenn was sitting as he asked the questions. Appellant's counsel on cross-examination made it amply clear to the jury that one of the assumptions of the question was that Carol Chaffin was erect when the shot hit her. It was open to the jury to disbelieve the testimony of Chief Wrenn and find instead that Carol Chaffin could have been leaning a great deal forward in the chair so that the shell would have traveled a downward course through her head as the x-ray showed.

■ Appellant also contends that the question was unfair because the exact height of the sofa was omitted, but this exact height would not be material to the answer so long as the level of the lap of a man seated on the couch was below the level of the mouth of a victim seated in the chair, and this was shown to be true by the photographic exhibits admitted into evidence. The exact position of appellant's hands as the gun discharged is also immaterial to the answer so long as the evidence tended to show that the gun was basically across appellant's lap. More-over, the question was favorable to appellant in that it omitted any assumption based on testimony to the effect that the shotgun was upside down on appellant's lap as well.

■ This hypothetical question was not unfairly framed. As it is stated in Zimberg v. United States,[2] it is hardly ever reversible error to admit opinion evidence since its foundation is left to cross-examination. Powdrill v. State[3] and Bailey v. State[4] do not persuade us to the contrary, for in each of those cases a doctor was allowed to testify as to which of several shots first hit the victim as related to the issue of self-defense. That was held reversible error because the evidence disclosed no basis whatsoever for the opinion given.

Appellant next assigns error to the fact that the prosecuting attorney called Carol Whiting as a witness knowing that she would claim her privilege against self-incrimination. It is said that by this means the State sought to establish prejudicial inferences of adultery and conspiracy which denied appellant a fair trial. Although the prosecution's motives in calling Carol Whiting are not entirely clear from the record and though there was some irregularity in this matter, we are not prepared to say on the basis of the authorities cited to us that reversible error was committed.

■ The federal authorities are well summarized in Namet v. United States[5] and United States v. Maloney.[6] These cases indicate that reversible error is not invariably committed when a witness who intends to claim his privilege is called to testify. Rather, the circumstances must show that the error is substantial and not merely "minor lapses through a long trial." [7] Cautionary instructions may cure the error.

2. 142 F.2d 132 at 135 (1st Cir. 1944), quoting L. Hand, J.

3. 62 Tex.Cr.R. 442, 138 S.W. 114 (Tex. Crim.App.1911).

4. 365 S.W.2d 170 (Tex.Crim.App.1963).

5. 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed. 2d 278 (1963).

6. 262 F.2d 535 (2nd Cir. 1959) per L. Hand, J.

7. United States v. Hiss, 185 F.2d 822, 832 (2nd Cir. 1950).

" * * * [T]he prosecutor need not accept at face value every asserted claim of privilege, *no matter how frivolous.*" [8] Thus, in the *Maloney* case, reversible error was found because the prosecution relied upon the testimony of one defendant who pleaded guilty and corroborated this testimony of an otherwise unbelievable state's witness by calling three other accomplices. The prosecution knew that two of these witnesses would claim their privilege but nevertheless went on to garner refusals to answer which led to inferences of vital elements of the charge. The refusals were emphasized in summation as well.[9] In the *Namet* case, no reversible error was found despite the fact that the witnesses called were also co-defendants who had pleaded guilty.

The State cases of DeGesualdo v. People [10] and State v. Nelson [11] involved respectively a co-defendant facing later trial on the same charge and a co-defendant who was asked twenty-eight questions as to vital elements of the charge on which he claimed his privilege. In both cases, the prosecution had ample reason to know that the co-defendant's claim of privilege would be effective. Thus, there was both prosecutorial misconduct and prejudice to the defendant in that it was not possible to cross-examine inferences made from the prosecution's unanswered questions.

■ In the present case, the witness, Carol Whiting, was not a co-defendant. She was asked only twenty questions during a five-day trial. She claimed her privilege on only nine of these, which the court denied on seven occasions. The prosecution discussed these questions, which

had been written out in advance, with counsel for the witness before they were asked. The inferences from the witness's refusal to answer were general and did not establish any vital elements of the charge against appellant. At most, the jury might have inferred that the witness had know appellant and his wife and had seen appellant's guns, but this was no more than had already been established by other testimony in the case. Moreover, the court gave a cautionary instruction in regard thereto.

Appellant also argues that it was reversible error to have allowed Frances Chaffin, a former wife of appellant who was assertedly his common-law wife at the time of trial, to testify as a State's witness. Appellant argues that this violated I.C. § 9–203(1), which disallows the examination of a wife against her husband without his consent, with certain exceptions. However, appellant's counsel failed to object at trial *on the grounds of marital privilege* to any of the testimony of this witness. Appellant's counsel interposed only three objections to Frances Chaffin's testimony, one of which was sustained, another of which stated no ground and was overruled, and the third of which stated that the question was "leading * * * prejudicial and irrelevant and incompetent."

■ There was no error in the trial court's disposition of these objections, for " * * * A failure to object upon the calling of the spouse to the stand must be equivalent to consent [to the admission of her testimony]." [12] "A rule of Evidence not invoked [as grounds for ob-

---

8. *Namet*, note 5, supra, 373 U.S. at p. 188, 83 S.Ct. at p. 1155.

9. United States v. Tucker, 267 F.2d 212 (3rd Cir. 1959), also involves only prejudicial comments by the prosecution in summation and is not pertinent here.

10. 147 Colo. 426, 364 P.2d 374, 86 A.L.R. 2d 1435 (1961).

11. Wash., 432 P.2d 857 (1967), citing Garland v. State, 51 Tex.Cr.R. 643, 104 S.W. 898 (1907) and Washburn v. State, 164 Tex.Cr.R. 448, 299 S.W.2d 706 (1956) which likewise involved co-defendants.

12. Wigmore, Evidence § 2242(3) (McNaughton ed. 1961); see Olender v. United States, 210 F.2d 795 at 800 (9th Cir. 1954).

jection] is *waived*."[13] State v. Riley[14] indicates nothing to the contrary, since it is there expressly stated that defendant's counsel interposed at trial a timely objection to the admission of any testimony of defendant's alleged common-law wife on the grounds of the statutory privilege. Appellant's counsel did object to one question on the ground of competency, but this has been held not to include the marital privilege,[15] and in any event the trial court was not given that specific ground. The question was not fairly before the trial court and therefore cannot be raised here.[16]

■ Appellant further alleges that the court committed reversible error in admitting into evidence exhibit B, Carol Chaffin's divorce complaint against appellant, and exhibit M, a photograph of the victim, Carol Chaffin. A careful review of the record indicates that appellant has not met his burden[17] of showing that the trial court erred in its discretionary determination,[18] after weighing probative value against possible prejudice, to admit these exhibits.

■ Appellant finally makes several other assignments of error which we find without merit. It was not error for the court to have omitted to instruct the jury as to the misdemeanor of "[i]njuring another by careless handling and discharge of firearms" set out in I.C. § 18-3312. That statute is not applicable for the reason that Carol Chaffin here was killed and not merely injured. As the verdict was supported by substantial evidence, we cannot say that the conviction is erroneous as a matter of law.[19] As appellant's sentence of five years imprisonment was within the limits prescribed by the statute[20] for involuntary manslaughter, we cannot say it is "cruel and unusual" punishment.[21]

For these reasons, the conviction is affirmed.

SMITH, C. J., and TAYLOR, McFADDEN, and SPEAR, JJ., concur.

13. Wigmore, op. cit. § 18 (emphasis in original); accord, People v. Kroeger, 61 Cal.2d 236, 37 Cal.Rptr. 593, 390 P.2d 369 at 375 (1964) (incompetency of spouse as witness in murder trial waived by failure to object), following People v. Odmann, 160 Cal.App.2d 693, 325 P.2d 495 at 497 (1958).

14. 83 Idaho 346, 362 P.2d 1075 (1961).

15. State v. Musser, 110 Utah 534, 175 P.2d 724 at 737 (1946), rev'd on other grounds: Musser v. Utah, 333 U.S. 95, 68 S.Ct. 397, 92 L.Ed. 562 (1948).

16. Cf. White v. Larsen & Shafer, 51 Idaho 187, 192, 3 P.2d 994, 995 (1931); Bell, Handbook of Evidence for the Idaho Lawyer 14 (1957).

17. State v. Cofer, 73 Idaho 181 at 190, 249 P.2d 197 at 202 (1952).

18. State v. Richardson, 76 Idaho 9 at 18, 277 P.2d 272 at 277 (1954); as to the admission of photographs, see State v. Martinez, 92 Idaho 183 at 188, 439 P.2d 691 at 696 (1968); State v. Linebarger, 71 Idaho 255 at 258-259, 232 P.2d 669 at 672 (1951); McKee v. Chase, 73 Idaho 491 at 501, 253 P.2d 787 at 792 (1953).

19. State v. Oldham, Idaho, 438 P.2d 275 at 286 (1968); State v. Snowden, 79 Idaho 266 at 271-272, 313 P.2d 706 at 709 (1957); State v. Weise, 75 Idaho 404 at 409, 273 P.2d 97 at 99-100 (1954); State v. Eikelberger, 72 Idaho 245 at 250, 239 P.2d 1069 at 1071, 29 A.L.R.2d 1176 (1952).

20. I.C. § 18-4007(2).

21. State v. Iverson, 77 Idaho 103 at 111, 289 P.2d 603, at 607 (1955); cf. King v. States, 91 Idaho 97, 416 P.2d 44 (1966); Mahaffey v. State, 87 Idaho 233, 392 P.2d 423 (1964).