591 P.2d 130

The STATE of Idaho,
Plaintiff-Respondent,

v.

Sally Joanne NEEDS,
Defendant-Appellant.

No. 12648.

Supreme Court of Idaho.

Feb. 26, 1979.

Ellison M. Matthews, Charles F. McDevitt, Alan E. Trimming, Boise, for defendant-appellant.

Wayne L. Kidwell, Atty. Gen., David H. Leroy, Sp. Asst. Atty. Gen., Lynn E. Thomas, Eugene A. Ritti, Deputy Attys. Gen., Boise, for plaintiff-respondent.

DONALDSON, Justice.

Sally Joanne Needs appeals her conviction and sentence for life imprisonment for murder in the first degree of Ronald Needs, her husband. In late June, 1976, a resident of Emmett, Idaho discovered a torso, without head and arms and partially burned, in Ada County near the Gem County line. Following investigation and examination of the corpse authorities tentatively established the identity of the corpse to be that of Ron Needs. Further investigation led Idaho authorities to arrest Sally Needs for the murder of her husband. Defendant pleaded not guilty. After a trial by jury, Needs was found guilty. The trial judge then sentenced her to life imprisonment.

On appeal defendant alleges six assignments of error relating to proper proof of venue, proof of the corpus delicti, adverse pretrial publicity, the prejudicial effect at trial of admitting various photographic evidence as well as testimony about the defendant's prior assault on Ron Needs, the failure of the trial court to give the jury a cautionary instruction with respect to certain testimony adduced at trial, and the trial court's imposition of a life sentence on the defendant.

Needs' first contention here, as at trial, is that the trial judge should have granted the defense motion for acquittal on the ground that the state failed to prove venue beyond a reasonable doubt. On Tuesday, June 29, 1976 at approximately 3:30 p. m., Louis Burke discovered a partially burnt human body without head and arms, wrapped in a bed sheet and covered by a door in Ada County approximately five miles south of the Ada-Gem County line and .7 of a mile east of State Highway 16. The Ada County Sheriff's Office began their investigation later that afternoon.

At the scene, investigators found some broken green glass and a white bottle cap about 20 feet from where the body was located. Near the body and towards the upper portion, investigators found two wooden match sticks. The area around the body was burned and there was quite a bit of partially burned debris and unburned cloth material near the body. Specifically, Officer Roberts of the Ada County Sheriff's Office testified to the finding of a partially burned piece of red pullover type bodyshirt, some zipper fragments, and a piece of blue synthetic type of fabric which may have come from a ski jacket or a sleeping bag. The body of the victim had some clothing on it as well; namely, the elastic band of a size 30–32 pair of jockey shorts and the upper band of a pair of brown levi type trousers.

Idaho's murder venue statute provides: The jurisdiction of a criminal action for murder . . . when the injury which caused the death was inflicted in one county and the party injured dies in another county or out of the state, is in the county where the injury was inflicted. I.C. § 19–312. In denying defendant's motion for acquittal the trial judge stated that the fact that the body was found in Ada County was sufficient evidence from which the jury could infer that the injury was inflicted in Ada County. We agree.

Idaho originally adopted its present murder venue statute from a California murder venue statute, which was in effect until 1939 and was prior to 1939 identical to our present statute. Subsequently, California amended its statute to allow for jurisdiction of a criminal action for murder in the county in which a body was found. However, prior to this amendment, a California district court of appeals had occasion to apply California's earlier murder venue statute to a fact situation remarkably similar to that now before us.

In *People v. Peete,* 54 Cal.App. 333, 202 P. 51 (1921) the state tried the defendant for murder in Los Angeles County. Authorities had discovered the victim's unrecognizable body in the basement of a house leased by the victim to the defendant in Los Angeles County. The court there held that venue was established where the uncontradicted circumstantial evidence showed that the body was found in the City of Los Angeles, in the basement of the house which the victim had leased to the defendant, many miles from the county line, covered with a mound of dirt, canvas and other articles, indicating that someone had physically placed the body there.

Likewise in the case now before us, the state presented uncontradicted evidence at trial that the authorities discovered the victim's decapitated body in Ada County some five miles from the Ada-Gem County line wrapped in a linen sheet and covered by a door showing as in the *Peete* case that someone had placed the body there. This evidence, unexplained, together with the evidence of other articles found at the scene were sufficient to justify the jury in concluding that the homicide was committed in Ada County.

Needs next argues that the state failed to prove the corpus delicti of the homicide beyond a reasonable doubt and that as a result the trial court erred in not granting defendant's motion for judgment of acquittal. It is Needs' more specific assertion that the prosecution did not prove beyond a reasonable doubt that the body discovered off of State Highway 16 was the body of defendant's husband, Ron Needs.

▇ In Idaho the corpus delicti in a homicide case consists of two elements, each of which the prosecution must prove to the satisfaction of reasonable men beyond a reasonable doubt. *State v. Cutler,* 94 Idaho 295, 486 P.2d 1008 (1971). The first element is the death of the person named in the charge (here Ron Needs). The second element is that the criminal action or means of the defendant caused the victim's death. *Id.* The state may prove each of these elements either by direct or circumstantial evidence. *Id.*

▇ The state, in its case in chief, presented circumstantial evidence to identify the body found as that of Ron Needs. Dr. Delbert Scott, a pathologist, performed the autopsy within six hours of its discovery on June 29, 1976. Although Dr. Scott observed six stab wounds on the body, he testified that those stab wounds did not contribute to the victim's death. He stated that gunshots, decapitation, or a slit throat may have caused the victim's death. He noted that the body was that of a 25–30 year old man. The extent of decomposition and charring, as a result of the body having been burned from the waist down, precluded observation of any superficial scars. The individual was circumcised. Based on his observations, Dr. Scott stated that the victim's death could have occurred anywhere from 47½ to 53½ hours prior to the time that he performed the autopsy. But it was also possible that death had occurred anywhere from 2 to 5 days prior to the autopsy. Dr. Scott noted that due to the existence of blow fly eggs on the body, that the body had been at the scene where it was discovered for 6 to 14 hours prior to its discovery.

A specialist in anthropology testified that the joint surface of the victim's pubic symphysis indicated that the victim was somewhere between 24 to 36 years of age. Analysis of the victim's femur bone indicated that he was in his early to middle 30's. Further analysis indicated that the victim was somewhere between 67 to 75 inches tall and most likely in the area of 71 inches tall. His weight was somewhere between 165 to 205 pounds. The specialist stated that from the standpoint of the bones analyzed the victim was male, probably Caucasian, and relatively healthy.

Ronald Needs' Idaho driver's license which was admitted into evidence indicated that he was 35 years of age, male, 71 inches tall, and weighed 175 pounds.

There was extensive testimony about the scar tissue found on the bottom of the victim's big toes as well as evidence of scars

on the bottom of Ronald Needs' big toes. Dr. Robert Richards, a pathologist, testified that examination of the victim's feet showed scarring on the bottom of both big toes. There was more prominent scarring on the left rather than the right. It was Dr. Richards' opinion that the victim had injured both big toes during life.

Ronald Needs' first wife testified that Needs had scars on both big toes of his feet. The scar on his left big toe was the result of running onto a knife when he was a child. She testified that that injury was larger than the injury to his right toe. She stated that the injury to his left toe cut his tendon which precluded him from bending his left toe down. While they were married, she massaged this tendon most evenings after work. Consistent with this testimony, Dr. Richards testified that he found scarring in the left toe tendon and tendon sheaf of the victim which would have had the effect of restricting the movement of the tendon and therefore the left toe.

With respect to Needs' right big toe, Needs' first wife testified that Ron Needs had cut it while swimming in a river in the summer of 1969 and that she took him to a hospital where a Dr. Krause cleaned it up. Dr. Krause testified that he had in fact treated Needs in the summer of 1969 for a laceration on his right foot.

The testimony of Ron Needs' girlfriend from Twin Falls provided the jury with more circumstantial evidence from which it could have concluded that the body discovered was that of Ron Needs. She testified that on Sunday, June 20, 1976 Needs visited her in Twin Falls to do some fishing and to show her the motor home which he had just purchased. She stated that on the following Tuesday, June 22, 1976, she thoroughly cleaned Needs' motor home while he went fishing. Needs left her residence later that day, and she never heard from him again.

Needs' girlfriend testified further that during the process of cleaning the motor home, she found an empty half gallon size green wine bottle in the sink. It was her opinion at trial that the color of glass found near where the victim's body was discover-ed was the same as the wine bottle she found in the motor home. Needs' girlfriend also identified the blue cloth found at the crime scene as being the same color as the sleeping bag which she had given Needs as a gift. She also identified the red tank top style Tee shirt material found at the crime scene as looking like the same tank top that she had washed for him during his visit to Twin Falls the week prior to his disappearance. She specifically stated that it was the same color and had the same color trim.

The state also introduced evidence of analyses performed on the two match sticks found where the body was discovered. The results of those analyses indicated that the lineal measurements of the two crime scene matches fell within the lineal measurements of the 22 matches found in the Needs' motor home, but did not fall within the ranges of lineal measurements taken from exemplar matches. Further, an X-ray fluorescence analysis on the matches indicated that it seemed likely that the two matches from the crime scene came from a box manufactured at the same time or perhaps at the same manufacturing plant as the matches found in defendant's vehicle.

■ To identify the defendant as Ron Needs' murderer, the second element of the corpus delicti, the state presented evidence as to the relationship between Ron Needs and the defendant, the defendant's state of mind prior to Needs' disappearance, and the time that the couple spent together prior to Needs' disappearance. Kenneth Mertz testified that in mid-June, 1976 he and another friend went over to the Needs' residence in Payette to help Ron Needs move out of that residence. Mertz stated that as the three men started loading Needs' personal property, defendant came out of the front door of the house and started throwing bottles at the three men. She then went back into the house and reemerged with a butcher knife in each hand. She approached Needs and made motions as if she was going to stab him. Mertz testified that the defendant kept saying "I'm going to get you." Needs successfully wrestled the knives from the defendant. Defendant then went into

the garage and got some gasoline which she threw on Needs getting some of the gas into his eyes.[1]

John Richardson testified that a week later after Needs had moved in with him, he overheard defendant say to another woman, "If I can't have him nobody will have him." "I will kill him first." A gas station attendant in Hammett, Idaho (some 20 miles southeast of Mountain Home) was the last person to see Ronald Needs at 4:10 p. m., Sunday, June 27, 1976, together with Sally Needs. He testified that after Needs bought some gas they headed for the Interstate Highway in a westerly direction.

Also relevant with respect to proving the second element of the corpus delicti is the evidence about the defendant's actions and conversations during June 28, 29 and 30, 1976. One of defendant's friends testified that shortly after midnight, around 12:30 a. m., June 28, 1976, defendant arrived at her house in the same motor home which Ron Needs was last seen driving. The friend's testimony was that defendant was crying and very upset. During the ensuing conversation between the two, defendant stated: "Oh, my God, I've killed Ron." Defendant explained that she and Ron Needs had been out camping in Payette on Friday, June 25 and had had an argument. At that time defendant stated that Ron told her that he was going to end it all. He then jumped in the river. Defendant further explained that when Ron Needs left the motor home to go jump in the river, she went and got her mother. When defendant and her mother returned, Ron Needs was sitting on the river bank. Defendant also told her friend that her husband didn't actually jump in the river and disappear until Sunday, June 27. Defendant told her friend that Ron and she were coming home on Sunday when they stopped and camped on the east side of Bliss. Defendant went to sleep in the motor home. When she awoke Needs was gone. Defendant stated that after waiting for quite some time at that spot, she left the area, returned to Boise and contacted her friend. Defendant departed from her friend's house at 1:00 a. m. and returned again 9½ hours later.

Mrs. Marcelene Westover testified that later that same day while returning from the family's farm she encountered the defendant and the motor home on the old Star dump road which is off of Highway 16 and 2 miles from where the victim's body was found. Defendant stated that she had gotten stuck when she pulled off of Highway 16 to find a place to fix something to eat. This was despite the fact that there was a clearly marked rest area for such a purpose on Highway 16 within a few hundred feet of the old Star dump road.

Defendant identified herself to Mrs. Westover as Karen. Defendant indicated that she and her husband had decided to take separate vacations and that she had been vacationing for the last three days. Mrs. Westover testified that when she had first encountered defendant, defendant seemed quite upset but then after a few minutes of conversation, she calmed down.

Mrs. Westover stated that after her husband and her son pulled the motor home out of the irrigation ditch, the defendant went back to Highway 16, proceeded north, and turned east off of Highway 16 on the next dirt road to the north, which was the same road where the body of the victim was found the following afternoon.

Mr. Dale Stedder testified that on the evening of June 28, 1976, he and three of his business associates were practicing target shooting on the same road where the body was found the next day. Approximately 30 to 45 minutes after the group had been shooting, they noticed a motor home matching the description of the Needs' motor home going up that road from Highway 16. Stedder stated that the motor home stopped some 75 or 100 yards short of the group, turned around and went back down the road.

Investigator Ronald Roman of the Gem County Sheriff's Department testified that

1. Needs also argues that the trial court erred in allowing the above evidence with respect to defendant's prior assault on the victim. See our discussion *ante.*

at about 6:30 p. m. on June 29, 1976, some three hours after the body was discovered, he was leaving the scene where the victim was found and driving on the dirt road back to Highway 16 when he encountered the Needs' motor home entering the crime scene area—about 160 yards from Highway 16. Defendant was driving the vehicle, and she indicated to Officer Roman that she had pulled off of Highway 16 to have a coke. Defendant told the officer that she and her husband had just been fishing and that she was taking her motor home back to her mother in Payette. After this both the defendant in her vehicle and Officer Roman in his returned to Highway 16 and proceeded north. Officer Roman then passed defendant's vehicle, proceeded to the Gem County line, pulled off the side of the road, and waited for the defendant's vehicle to come by. He testified that defendant's vehicle never did pass by his location even though he waited at that position for five minutes.

Officer Jack Freeman testified that the defendant filed a missing person's report on her husband at the Elmore County Sheriff's Office on June 30, 1976. The initial information that Officer Freeman received was that Mr. Needs had walked out of the motor home at a location by some water somewhere between Bliss and Hammett in Elmore County. In the course of the ensuing investigation, defendant told Officer Freeman that she and her husband had been fishing in Elmore County over the weekend of June 26 and 27. Defendant told Officer Freeman that on Sunday, June 27 she and her husband started back towards Boise. The couple made two or three stops along the way at which times defendant stated that her husband took a sleeping pill and drank beer. As it was getting dark, she went to the back of the motor home and went to sleep. When she woke up Ron Needs was gone.

Officer Freeman also testified that in connection with the missing person's report, he and one other deputy transported the defendant to four different locations along the Snake River west of Glenns Ferry to determine if any of those places refreshed defendant's memory as being the location that Mr. Needs had left the motor home. The officers never did locate any place that satisfied the defendant's description. Defendant also told Officer Freeman that she had taken the motor home back to Boise on Sunday evening following her husband's disappearance, parked it at a friend's house and had not moved it since that time. Twice in response to Officer Freeman's question as to whether defendant had been up around the Emmett area over that weekend, defendant responded that it had been ages since she had been in that area.

In our opinion, the totality of the state's evidence, both circumstantial and direct, offered to prove both elements of the corpus delicti in this case, was such that the jury could have found, as it did, that the state established the corpus delicti beyond a reasonable doubt.

At trial, defense counsel moved for a change of venue on two separate occasions on two separate grounds: (1) prior to trial on the ground that the publicity surrounding the disappearance of Ron Needs, the arrest of Sally Needs and her being charged with Ron Needs' murder was so extensive that she could not receive a fair trial in Ada County; and (2) after voir dire and prior to swearing in the jury on the ground that every juror to be sworn in the case testified that he/she had been exposed to publicity in the Boise area, regarding the circumstances of this case.

The trial court denied the first motion for change of venue noting that the length of time which intervened between the time of the publicity and the trial was considerable. The trial judge declined to grant the motion until the defense could demonstrate that the jurors actually remembered specific details of the publicity which would interfere with their fair consideration of the case.

After voir dire, the trial judge again denied a defense motion for a change of venue stating that there had been no showing of a pervasive feeling of hostility or guilt towards the defendant. The judge noted that he had questioned the panel and to his

satisfaction the panel was composed of persons whose memories with respect to publicity on the case were quite limited.

▪▪▪ Needs now complains that the trial judge erroneously denied her motions for a change of venue. In her brief, she acknowledges that the jurors professed impartiality at voir dire, but argues that their general recollections of the case as gained from past media reports were bound to have at least a subconscious, adverse impact of their deliberations. The state on the other hand submits that the empaneled jurors were qualified to decide this case and a change of venue from Ada County was unnecessary.

I.C.R. 21 provides:

The court upon motion of either party shall transfer the proceeding to another county if the court is satisfied that a fair and impartial trial cannot be had in the county where the case is pending.

See also I.C. § 19–1801. This Court has held on many occasions that the decision to grant or deny a change of venue rests within the sound discretion of the trial court. State v. Powers, 96 Idaho 833, 537 P.2d 1369 (1975); State v. Thomas, 94 Idaho 430, 489 P.2d 1310 (1971); State v. Bitz, 93 Idaho 239, 460 P.2d 374 (1969); State v. Cypher, 92 Idaho 159, 438 P.2d 904 (1968). Further, where it appears that the defendant actually received a fair trial and that there was no difficulty experienced in selecting a jury, the trial judge's refusal to grant a change of venue is not a ground for reversal. Among the factors which this Court will consider in determining whether a criminal defendant actually received a fair trial are affidavits indicating prejudice or an absence of prejudice in the community where the defendant was tried, testimony of the

jurors at voir dire as to whether they had formed an opinion of the defendant's guilt or innocence based upon adverse pretrial publicity, whether the defendant challenged for cause any of the jurors finally selected, the nature and content of the pretrial publicity,[2] and the amount of time elapsed from the time of the pretrial publicity to the trial itself.[3] See e. g., State v. Bitz, supra. Publicity by itself does not require a change of venue. Id.

We note at the outset that the United States Supreme Court's recent decision in Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) espouses the totality of the circumstances test in cases involving a claim of denial of the sixth amendment right to an impartial jury. We perceive Needs' challenge of the trial court's refusal to grant her motions for change of venue, because of adverse pretrial publicity, to be synonymous with a claim of denial of the sixth amendment right to an impartial jury.[4] See State v. Beason, 95 Idaho 267, 506 P.2d 1340 (1973). However, it is not essential to our discussion that we so view her claim since this Court has essentially used a totality of the circumstances analysis in resolving claims of error in not granting motions for change of venue based on adverse pretrial publicity since 1902. See State v. Gilbert, 8 Idaho 346, 69 P. 62 (1902). The United States Supreme Court test of whether there are any indications in the totality of circumstances that a defendant's trial was not fundamentally fair is, in effect, the same as the long standing Idaho test of whether it appears that the defendant had a fair trial and whether any difficulty was experienced in securing a jury.

---

2. Articles appearing shortly before a trial containing merely factual accounts of the arraignment and pretrial events and not containing editorials or opinions tending to arouse the feelings of passion of the public do not deny a defendant a fair trial. State v. Bitz, supra.

3. Lapse of time from the time of the publishing articles about a defendant and the crime allegedly committed, to the time of trial, lessens

the prejudicial impact of such articles. State v. Bitz, supra.

4. In Parker v. Gladden, 385 U.S. 363, 364, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966), the United States Supreme Court made the federal constitution's sixth amendment requirement for a trial by "an impartial jury" applicable to the individual states through the fourteenth amendment.

We note the evidence in the record before us which leads us to conclude that Needs had a fair trial by an impartial jury. At voir dire, the trial judge asked the panel if any one of them remembered having read or heard anything about the case in the newspapers or on the radio, television, or any other source. Of the prospective jurors who responded that they did have some memory of the case from past media coverage, two were disqualified by the trial judge because of the bias they had developed against the defendant as a result of these past media accounts. Three prospective jurors indicated that they remembered specific details from the past media coverage of the Needs' case. However, after extensive questioning by the trial judge, defense counsel and the prosecution, it became apparent that these three jurors' recollections were very hazy at best. In addition each stated that he would be able and willing to put what media coverage he recalled out of his mind and decide the case upon the evidence at trial.

The remaining jurors actually selected had no specific memory of any facts in the Needs' case. All twelve stated that they had formed no opinion as to the guilt or innocence of Sally Needs.

■ It is apparent from the transcript of the voir dire examination that the trial court made every effort to ensure the empanelling of an impartial jury. It was not incumbent upon the trial judge to find jurors who were totally ignorant of the facts and issues involved in this case. As the United States Supreme Court stated in *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961):

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.* at 723, 81 S.Ct. at 1642. Each juror empaneled stated that he or she could lay aside general memories from media coverage of the Needs' case and render a verdict based on the evidence presented at trial. The record contains no indication of the actual existence in any one juror's mind of an opinion which would raise a presumption of partiality.

We also note that the newspaper articles which defendant made part of the record appeared in print from July 1, 1976 to December 24, 1976. The trial began some five months later. Under such circumstances it appears that the intervening five months dissipated whatever prejudicial impact those articles may have had. The comments of the jurors selected with respect to their memories of media coverage support this conclusion. Further there were no editorials or opinions expressed in those articles which in our view would have aroused feelings of passion in the public. *State v. Bitz, supra*, 93 Idaho at 243, 460 P.2d 374.

■ Considering the record as a whole, including the transcript of the voir dire examination, it appears that there was no difficulty in selecting the jury and that the defendant received a fair trial. As in *Murphy v. Florida, supra*, Needs has failed to show that the setting of the trial was inherently prejudicial or that the jury selection process of which she complains permits an inference of actual prejudice. The trial court did not abuse its discretion in denying defendant's motions for change of venue.

Needs on appeal also renews her trial objections to certain items of photographic evidence which the state introduced as part of its case in chief and admitted into evidence, including a black and white videotape of the crime scene and the body itself as it was originally discovered, two crime scene color photos depicting the burned feet of the victim, two crime scene photos depicting the exposed torso and legs of the victim, and two photos, one of the torso and one of the legs of the victim taken just prior to the autopsy. Needs complains that the prejudicial, inflammatory and repetitive nature of these evidentiary items exceeded their probative value.

In *State v. Martinez*, 92 Idaho 183, 439 P.2d 691 (1968) this Court set out the general rule as to admissibility of photographs of the victim in a prosecution for homicide.

. . . photographs of the victim in a prosecution for homicide, duly verified and shown by extrinsic evidence to be faithful representations of the victim at the time in question are, in the discretion of the trial court, admissible in evidence as an aid to the jury in arriving at a fair understanding of the evidence, proof of the *corpus delicti*, extent of injury, condition and identification of the body, or for their bearing on the question of the degree or atrociousness of the crime, even though such photographs may have the additional effect of tending to excite the emotions of the jury. [Citations omitted]

*Id.* at 188, 439 P.2d at 696.

In the instant case, the Ada County Prosecutor filed an information charging that Sally Needs:

. . . did . . . knowingly, wilfully, intentionally, unlawfully and feloniously with premeditation and malice aforethought . . . of her own deliberate and premeditated malice aforethought with the intent to kill, kill and murder . . . Ron Needs. . . .

The record clearly indicates that the trial judge carefully considered defendant's objections to the videotape and photographs. With respect to the videotape, the trial judge stated that in his opinion the contents of the videotape were not at all inflammatory especially when compared to the color photographs which Needs argues should not have been admitted. While he considered those photographs to be inflammatory, the trial judge noted that the identity of the victim was a critical issue in the case. Thus because of the probative value for identity purposes of showing the condition of the body, i. e. to corroborate what witnesses would testify to as to what they could or could not observe on the body when they examined it, he admitted all six of the color photographs in issue here as well as the videotape. In his mind as in ours, the probative value of the photos and the video-

tape and their unquestionable relevance to the issue of identity outweighed their inflammatory nature. The photographs and the videotape were authenticated as being true and correct representations of the objects portrayed. Here, as in *State v. Martinez, supra*, the trial court did not abuse its discretion in the admission of these exhibits.

Needs also appeals the trial judge's decision to allow the jury to hear the testimony of Kenneth Mertz regarding defendant's butcher knife assault on her husband approximately two weeks prior to his death. She first argues that because Mertz's testimony related to an assault which was not part of a single transaction leading to Ron Needs' death, his testimony was inadmissible. In rejecting this argument we simply note that when the trial judge admitted this evidence, he specifically stated that he was not admitting testimony of Needs' prior assault on the ground that the prior assault was part of the same transaction leading to his death:

I think we're dealing, really about proof of intent here and—or motive. I don't think we're even talking about a common scheme or plan.

The trial judge did indicate that where an assault preceded an alleged homicide, evidence of that prior assault would be admissible to show a homicide defendant's motive or intent. The judge went on to say that in his mind evidence of a prior assault tends to prove intent if it was clearly related in time and involved the victim of the alleged homicide as well as the defendant. Needs takes the opposite position, contrary to Idaho law, arguing that the intent manifested in a separate transaction should not be used to establish intent in another.

Idaho courts do follow the general rule that evidence of other unrelated criminal activity is inadmissible at trial to show criminal propensity on the part of the accused. *State v. Wrenn*, 99 Idaho 506, 584 P.2d 1231 (1978). However, this jurisdiction will admit evidence of defendant's past criminal activity to prove: (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embrac-

ing the commission of two or more crimes so related to each other that proof of one tends to establish the other, (5) the identity of the person charged with the commission of the crime on trial, and (6) other similar issues. *Id.* Specifically, in homicide and assault cases involving spouses, Idaho courts have allowed testimony as to a defendant's prior assaults on the deceased spouse to illustrate the mental attitude of the accused toward the deceased spouse and to prove motive. *State v. Frank*, 60 Idaho 774, 97 P.2d 410 (1939); *State v. Muguerza*, 46 Idaho 456, 268 P. 1 (1928).

We have reviewed the testimony which Sally Needs complains of regarding her prior assault upon her husband two weeks before his death. Such evidence is clearly relevant to her motive and intent as well as to shed considerable light on her mental attitude towards Ron Needs. It was not error for the trial judge to admit Kenneth Mertz's testimony.

Appellant's next contention is that the trial court erred in not giving a cautionary instruction regarding certain testimony of Ron Needs' girlfriend from Twin Falls. His girlfriend testified at trial that it was her expectation when she saw the victim a week prior to his disappearance that she and Ron Needs were going to get married in the near future. Defendant claims, for the first time on appeal, that the trial judge should have given a limiting or cautionary instruction regarding what she refers to as, "the state of mind hearsay testimony attributed to the alleged deceased."

We reject Needs' claim. The record reflects that the state elicited the girlfriend's testimony to establish that she had no logical cause to be involved in Ron Needs' disappearance since she loved him and expected to marry him. The state on direct examination was very careful to limit her testimony by asking her to relate, not what Needs had told her, but what her expectations were when she saw him the week prior to his disappearance. This testimony is not hearsay, and therefore the trial judge did not err in not giving a cautionary instruction to the jury.

Lastly, Needs assigns error to the trial court's imposition of a life sentence upon her for the first degree murder of Ron Needs. Prior to trial in October 1976 the trial judge stated that although defendant was charged with first degree murder, the United States Supreme Court case of *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) appeared to invalidate the mandatory death penalty provision embodied in the 1976 version of I.C. § 18–4004. We so held in the recent companion cases; *State v. Lindquist*, Idaho, 589 P.2d 101 (1979), and *State v. Creech*, Idaho, 589 P.2d 114 (1979). Subsequent to defendant's arraignment but prior to trial, the Idaho state legislature amended the mandatory death provision out of I.C. § 18–4004, effective March 28, 1977. At sentencing in June, 1977, the trial judge sentenced defendant to life imprisonment, the maximum penalty for second degree murder. He based his decision on the fact that at the time Sally Needs committed the crime, I.C. § 18–4004 was unconstitutional. However, because second degree murder was a necessarily included offense, he imposed the maximum sentence for second degree murder—namely, life imprisonment.

As in *State v. Lindquist, supra,* and *State v. Creech, supra,* the punishment for second degree murder was in effect at the time of Ron Needs' death as well as at the time of Sally Needs' trial and sentencing. Therefore, the trial judge was correct in sentencing her to life imprisonment under the lesser included offense of second degree murder.

For the reasons stated in this opinion, we affirm the conviction and sentence of Sally Needs.

SHEPARD, C. J., and McFADDEN, BAKES, and BISTLINE, JJ., concur.