710 P.2d 1202

**STATE of Idaho, Plaintiff-respondent,**

v.

**Donald Kenneth FETTERLY,
Defendant-appellant.**

**No. 15419.**

Supreme Court of Idaho.

Oct. 28, 1985.

Rehearing Denied Jan. 17, 1986.

Van G. Bishop, Nampa, for defendant-appellant.

Jim Jones, Atty. Gen., and Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent.

BAKES, Justice.

Appellant Donald Fetterly appeals from a conviction for first degree murder and the imposition of the death penalty.

On September 7, 1983, Sterling Grammer was stabbed to death in Caldwell. Five days later, Donald Fetterly and Karla Windsor were charged with first degree murder, robbery, and use of a deadly weapon.

The record reflects that Fetterly had become acquainted with the victim through Fetterly's ex-mother-in-law, Violet Hogan. On the evening of September 6, 1983, Fetterly and Windsor entered Grammer's home intending to steal Grammer's personal belongings. They remained in Grammer's home until Grammer returned the following morning. Although it is somewhat unclear what events transpired following Grammer's return, Grammer's hands were eventually taped behind his back. Grammer's feet were also taped together, and duct tape was wrapped about his face. Grammer was then stabbed repeatedly. Grammer's lifeless body was dumped into the Snake River, where it was found on September 9, 1983. Fetterly and Windsor took Grammer's car, pickup truck, and other personal items. Some of these items were later sold by Fetterly and Windsor.

On September 10, 1983, Fetterly and Windsor were apprehended while driving Grammer's truck.

Since Fetterly and Windsor had also previously been seen driving Grammer's car, Windsor was asked to reveal the location of Grammer's car. Windsor was questioned as to the location of Grammer's car prior to being read her *Miranda* rights. After being questioned as to the location of the car, Windsor asked to see Fetterly. The two defendants then talked to each other and agreed to make a joint statement. A *Miranda* warning was read to each of the defendants prior to their making this statement. In the statement Fetterly admitted killing Grammer, but claimed that he could not remember actually stabbing Grammer.

The defendants' trial was set for December 12, 1983. Prior to trial the case received extensive newspaper coverage which contained details of the crime and the relationship between Fetterly and Windsor. The extensive coverage also contained information as to Fetterly's and Windsor's previous arrest for fraudulent use of a credit card, an outstanding warrant against Fetterly for writing a check with insufficient funds, the probable motive for Grammer's murder, and the opinion of the Canyon County prosecuting attorney as to the credibility and validity of the evidence. Fetterly filed a motion for change of venue or, in the alternative, a motion for selection of a jury from a county other than Canyon. Each motion focused on the extensive pretrial publicity given the case, alleging that the publicity would deny Fetterly a fair trial. Both motions were denied by the trial court.

Several other pretrial motions were filed, including a motion to sever the trial of the two defendants, a motion to suppress Fetterly's statements, and a motion to suppress Fetterly's prior criminal record. Additionally, a motion was made to sever Windsor's defense from Fetterly's due to a conflict of interest. The court granted the motions to sever the trial, to suppress Fetterly's criminal record, and to allow withdrawal of counsel from Windsor's defense. The motion to suppress Fetterly's statement was denied.

On December 7, 1983, five days before trial, Fetterly made motions to compel discovery and for a continuance. At this time, Fetterly alleged that forensic lab reports had not yet been made available to the defense. Arguments on this motion were set for December 9, 1983. By December 9, 1983, Fetterly had received the requested reports. The motion to continue was denied. Jury selection then began on December 12, 1983.

On December 15, 1983, the jury returned a verdict finding Fetterly guilty of burglary, grand theft, and first degree murder. In finding Fetterly guilty of first degree murder, the jury found both first degree murder with premeditation *and* first degree murder under I.C. § 18–4003, the felony murder statute.

On January 11, 1984, a psychological examination of Fetterly was ordered. Notice of intent to seek the death penalty was filed January 31, 1984. An aggravation and mitigation hearing was held on February 23, 1984. On February 24, 1984, Fetterly was sentenced to death for first degree murder and given an indeterminate five-year sentence for burglary and an indeterminate fourteen-year sentence for grand theft, to be served consecutively. A death warrant and findings were filed pursuant to I.C. § 19–2515. Fetterly appeals the judgment of conviction and the death sentence.

## I

Fetterly contends that the trial court abused its discretion in denying his motion for a change of venue. Fetterly maintains that the extensive publicity prior to trial deprived him of the opportunity to be tried before an impartial jury. We disagree.

The decision as to whether or not to grant a motion for a change of venue lies within the discretion of the trial court. *State v. Thomas*, 94 Idaho 430, 432, 489 P.2d 1310, 1312 (1971); *State v. Bitz*, 93 Idaho 239, 242, 460 P.2d 374, 377 (1969). "[W]here it appears that the defendant actually received a fair trial and that there was no difficulty experienced in selecting a jury, refusal to grant a change of venue is

not a ground for reversal." *State v. Thomas*, 94 Idaho at 432, 489 P.2d at 1312.

In determining whether a criminal defendant received a fair trial, this Court will consider

"affidavits indicating prejudice or an absence of prejudice in the community where the defendant was tried, testimony of the jurors at voir dire as to whether they had formed an opinion of the defendant's guilt or innocence based upon adverse pretrial publicity, whether the defendant challenged for cause any of the jurors finally selected, the nature and content of the pretrial publicity, and the amount of time elapsed from the time of the pretrial publicity to the trial itself." *State v. Bainbridge*, 108 Idaho 273, 698 P.2d 335 (1985) (*quoting from State v. Needs*, 99 Idaho 883, 890, 591 P.2d 130, 137 (1979)) (footnotes omitted).

No affidavits indicating prejudice or an absence of prejudice in the community were submitted. During *voir dire* each juror was extensively questioned to determine the degree of their exposure to the pretrial publicity. Those jurors who had been exposed to the publicity were further questioned to determine if they had formed an opinion as to the guilt or innocence of the defendant.

The record reflects that Fetterly did not challenge for cause any of the jurors finally selected, nor did Fetterly use all of his peremptory challenges. Waiver of peremptory challenges has been found to indicate satisfaction with the panel chosen. *See State v. Brooks*, 103 Idaho 892, 899, 655 P.2d 99, 105 (Ct.App.1982). The district court did not err in denying Fetterly's motion for a change of venue.[1]

---

1. We have reviewed the newspaper articles in question and do not find the publicity, under the facts of this case, to be prejudicial. Most of the coverage of the crime was published three months prior to trial. Further, the jury was questioned as to whether they had seen the newspaper coverage published the night before the trial. Specifically, the record reflects that shortly after 9:00 a.m. on December 13, 1983, before any evidence was presented, the following exchange occurred:

"COURT: Ladies and gentlemen, were any of you approached, or did anything happen during the evening recess that would change your ability to sit as a fair and impartial juror in this matter? (Whereupon all jurors indicated there was no problem.)
"COURT: No one was confronted with any information, nothing was heard or read in the news media or anything of that nature? (Whereupon all jurors indicated they had no problem)."

## II

■ Fetterly contends that the trial court abused its discretion by denying his motion for a continuance. This argument is an extension of his change of venue argument. Fetterly argues that the trial judge should have granted a continuance to allow the harmful press coverage to dissipate. However, as stated above, there is every indication that an impartial jury was empaneled and that Fetterly received a fair trial. Accordingly, the trial judge did not abuse his discretion by refusing to reschedule the trial.

Fetterly also argues that a continuance should have been granted because his defense was prejudiced by the delayed discovery of laboratory reports and the trial court's failure to rule upon the admissibility of his confession until shortly before the trial. His argument essentially is that since he did not know until shortly before trial that his confession was going to be admitted, "the physical evidence and laboratory results would have been absolutely critical to tying the defendant to the apartment of the deceased...."

■ However, the defendant has not set out any particular claim of physical evidence or laboratory results which were denied him. There were no state or federal lab reports introduced as exhibits at trial, and the only forensic laboratory technician who testified was a state employee, Pamela Server, who testified that the duct tape removed from the victim had been taken from rolls of duct tape found in the victim's bedroom, and various items belonging to the victim had Type O blood on them. It was never established at trial whether or not the victim Grammer had Type O blood, and that fact was of no significance at the trial. Further, in the defendant's confession, which the trial court found to be admissible, he admitted that he used the victim's own duct tape which he found on the premises to bind the victim's hands and feet prior to stabbing him to death with a

knife. There has been no showing how the failure to produce essentially unidentified scientific laboratory reports until shortly before trial impaired the defendant's ability to prepare his defense. Accordingly, we find no error resulted from the trial court's refusal to grant a continuance because of the alleged delayed discovery.

## III

Although Fetterly acknowledges that he was read his *Miranda* rights prior to making the joint statement, Fetterly alleges that Windsor was questioned prior to being read her *Miranda* rights. He argues that Windsor was thus coerced into agreeing to make a joint statement. Fetterly concludes that this stream of events brought psychological pressure to bear on him, inducing him to agree to make the joint statement after talking with Windsor.

The defendant's argument lacks merit for at least two reasons. First, there is nothing in the record to support appellant's argument that the alleged violation of Windsor's *Miranda* rights induced him to agree to make a joint statement, which somehow violated his constitutional rights. The record does reflect that prior to co-defendant Windsor being advised of her *Miranda* rights, she was asked about the location of the victim's car, and she gave the police officers the phone number of the person at whose home the car was located. No further questioning of Windsor was made until after she had been advised of her *Miranda* rights. After the initial questioning as to the location of the car, Windsor asked to speak to Fetterly. The statement which she and appellant Fetterly later made was not connected to the questioning about the location of the car. After Windsor had conferred with Fetterly, both agreed to give a joint statement. Both were then given the *Miranda* warnings prior to their making the statement, which was the appellant Fetterly's only statement to the police at that time. We have care-

Having considered the circumstances surrounding the pretrial publicity, and the steps taken to ensure that the defendant received a fair trial, we must agree with the district court's exercise of its discretion.

fully reviewed the entire record and find no evidence to support the appellant's allegation that the initial inquiry to his co-defendant Windsor prior to her being advised of her *Miranda* rights had any effect upon his subsequent post-*Miranda* statement. We agree with the trial judge that

"[t]he record is void of any psychological pressure brought to bear upon the defendants. There was only the one officer present, they were given a period of time [to speak with each other], they were allowed to confer with each other, they were allowed to stop the statement or the statements they were giving at any time they were upset by the nature of the statement that was going on. There is just no indication at all at this point that they were pressured or coerced in any way."

■ Furthermore, in the recent decision of the United States Supreme Court in the case of *Oregon v. Elstad*, —— U.S. ——, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court concluded that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." —— U.S. at ——, 105 S.Ct. at 1298. In this case the appellant Fetterly is not complaining of his own "unwarned yet uncoercive questioning," but that of a co-defendant made outside of his presence. The result in *Oregon v. Elstad, supra,* would appear to be even more compelling under these circumstances. After examining the totality of the circumstances surrounding the making of the statement, we find that the statement was voluntarily made.

## IV

Fetterly also objects to the editing of his statement. The trial judge edited the joint statement, deleting Windsor's statements, to ensure that only Fetterly's answers would be read into evidence. Fetterly contends that the statement read into evidence was incomplete and misleading. He argues that the only way to preserve his due process rights would be to hold the joint statement completely inadmissible. We disagree.

■ Although the question has not previously been addressed in Idaho, other jurisdictions allow editing of a defendant's statement when the editing will not mislead the jury. *See Hager v. State*, 665 P.2d 319, 324 (Okl.Crim.1983); *State v. Bird*, 59 Or. App. 74, 650 P.2d 949, 951 (1982); *State v. Purdy*, 228 Kan. 264, 615 P.2d 131 (1980). Here, Fetterly has not shown that the edited statement is misleading.

■ In Idaho, barring exceptional circumstances, confessions or incriminating statements made by a suspect after being informed of his rights are admissible. *State v. Larsen*, 91 Idaho 42, 46, 415 P.2d 685, 689 (1966). Here, we find no exceptional circumstances. Fetterly voluntarily agreed to make the joint statement and was informed of his *Miranda* rights prior to making the statement. Further, the statement, which was edited only to make certain that Windsor's statement was not used against Fetterly, thus ensuring that Fetterly was accorded full due process, was not objected to at trial. Thus, having fully reviewed the record, we find no error in the trial court's editing of Fetterly's statement.

## V

■ Fetterly maintains that the jury was erroneously instructed on the felony murder rule. He argues that if a burglary was committed, the burglary was complete before the victim arrived at his home.

As the state points out in its brief, "The narrow construction Fetterly urges upon the Court would deprive [the felony murder rule] of any validity unless the victim was killed while the burglar had one leg over the windowsill or one foot across the threshold." We agree with the state's position. Grammer's death was part of a stream of events which began the evening Fetterly and Windsor entered Grammer's home and ended the following day when

Grammer's possessions were removed from the home.

## VI

 Nor do we agree with Fetterly that the admission into evidence of photographs of the deceased constituted prejudicial error. The general rule is that photographs of the victim in a prosecution for homicide are, at the discretion of the trial court, admissible into evidence. *State v. Martinez*, 92 Idaho 183, 188, 439 P.2d 691, 696 (1968). Such photographs may aid the jury in arriving at a fair understanding of the evidence. Having reviewed the photographs, we find no abuse of the trial court's discretion in the allowance of the photographs.

## VII

 Lastly, Fetterly argues that the Idaho death penalty procedure is unconstitutional. Fetterly maintains that Idaho's Constitution, Art. 1, § 7, mandates a jury-imposed death sentence. This Court has previously addressed the issues which Fetterly raises here. *See State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983); *State v. Creech*, 105 Idaho 900, 670 P.2d 463 (1983). We continue to adhere to the position stated in both *Creech* and *Sivak*, and find the Idaho death penalty procedure to be constitutional.

## VIII

Pursuant to I.C. § 19–2827,[2] this Court is to review the imposition of the death penalty to determine if the sentence of death was (1) imposed under the influence of passion, prejudice or any other arbitrary factor; (2) whether the evidence supports

the judge's finding of a statutory aggravating circumstance, and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases.

 We believe that the findings of the trial court, in considering the death penalty under I.C. § 19–2515, reflect a rational dispassionate evaluation of the factual circumstances of the case and demonstrate a thorough consideration of all of the relevant evidence produced at the sentencing hearing. There is no indication that sentence was imposed under the influence of passion, prejudice or any other arbitrary factor.

The aggravating circumstances found by the trial court are amply supported by the record. The trial court found that the defendant entered the victim's home on the evening of September 6, for the express purpose of taking the victim's property which he could sell to obtain money to live on. The defendant remained in the home overnight, waiting for the victim, who had befriended him, to return home. When he returned, the victim was hit over the head, bound with duct tape around his wrists, legs, with tape placed over his eyes and mouth to silence him, and even over his nose which would have ultimately asphyxiated him. Then the defendant savagely stabbed the victim's "body no less than five times, severing not only vital organs, but completely cutting the breastbone (sternum); the force was intentional and with considerable strength." The body was then callously disposed of by throwing it into the Snake River. The trial court also found that "several hours after the killing, and when shock would normally set in on the average human being, the defendant went back to the victim's home, gathered

2. **"19–2827. Review of death sentences—Preservation of records.**—(a) Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, *the sentence shall be reviewed* on the record by the Supreme Court of Idaho. ·....

(b) The Supreme Court of Idaho shall consider the punishment as well as any errors enumerated by way of appeal.

(c) With regard to the sentence the court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

(2) Whether the evidence supports the judge's finding of a statutory aggravating circumstance from among those enumerated in section 19–2515, Idaho Code, and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." (Emphasis added.)

up the victim's belongings and commenced selling them around town as though nothing had happened; blatantly and openly drove the victim's vehicle as though with permission."

■ The trial court further found that the commission of the crime had been planned as much as two or three days in advance. The evidence supports the above findings from which the trial court concluded that the murder was especially heinous, atrocious or cruel, manifesting exceptional depravity; that by the murder or the circumstances surrounding its commission the defendant exhibited utter disregard for human life; and that the murder was committed in the commission of a felony, *i.e.,* burglary, and was accompanied by the specific intent to cause the death of a human being. The record amply supports the trial court's finding of those aggravating circumstances.

■ Finally, we have reviewed our prior cases to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Comparing these cases[3] with the record, the trial court's findings in support of the death penalty, and the pre-sentence report in this case, we conclude that the sentence imposed in this case is not disproportionate to other cases in which the imposition of the death penalty has been approved.

Accordingly, the judgment of the district court imposing the death penalty is affirmed.

DONALDSON, C.J., and SHEPARD, J., concur.

HUNTLEY, Justice, concurring specially.

I concur in the opinion of the majority save and except for my reservations relative to the constitutionality of failing to involve the jury in the capital sentencing process which reservations I have expressed in *State v. Sivak,* 105 Idaho 900,

3. Those cases we have considered include:

*State v. Bainbridge,* 108 Idaho 273, 698 P.2d 335 (1985); *State v. Aragon,* 107 Idaho 358, 690 P.2d 293 (1984); *State v. McKinney,* 107 Idaho 180, 687 P.2d 570 (1984); *State v. Paradis,* 106 Idaho 117, 676 P.2d 31 (1983); *State v. Gibson,* 106 Idaho 54, 675 P.2d 33 (1983); *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983); *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983); *State v. Major,* 105 Idaho 4, 665 P.2d 703 (1983); *State v. Mitchell,* 104 Idaho 493, 660 P.2d 1336 (1983), *cert. den.* 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983); *State v. Carter,* 103 Idaho 917, 655 P.2d 434 (1982); *State v. Olin,* 103 Idaho 391, 648 P.2d 203 (1982); *State v. Stormoen,* 103 Idaho 83, 645 P.2d 317 (1982); *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981); *State v. Griffiths,* 101 Idaho 163, 610 P.2d 522 (1980); *State v. Padilla,* 101 Idaho 713, 620 P.2d 286 (1980); *State v. Fuchs,* 100 Idaho 341, 597 P.2d 227 (1979); *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979); *State v. Lindquist,* 99 Idaho 766, 589 P.2d 101 (1979); *State v. Bradley,* 98 Idaho 918, 575 P.2d 1306 (1978); *State v. Birrueta,* 98 Idaho 631, 570 P.2d 868 (1977); *State v. Allen,* 98 Idaho 782, 572 P.2d 885 (1977); *State v. Ward,* 98 Idaho 571, 569 P.2d 916 (1977); *State v. Gerdau,* 96 Idaho 516, 531 P.2d 1161 (1975); *State·v. Powers,* 96 Idaho 833, 537 P.2d 1369 (1975) *cert. den.* 423 U.S. 1089, 96 S.Ct. 881, 47 L.Ed.2d 99; *State v. Hokenson,* 96 Idaho 283, 527 P.2d 487 (1974); *State v. Hatton,* 95 Idaho 856, 522 P.2d 64 (1974); *State v. Standlee,* 96 Idaho 165, 525 P.2d 360 (1974); *State v. Foley,* 95 Idaho 222, 506 P.2d 119 (1973); *State v. Beason,* 95 Idaho 267, 506 P.2d 1340 (1973); *State v. Atwood,* 95 Idaho 124, 504 P.2d 397 (1972); *State v. Sanchez,* 94 Idaho 125, 483 P.2d 173 (1971); *State v. Gomez,* 94 Idaho 323, 487 P.2d 686 (1971); *State v. Dillon,* 93 Idaho 698, 471 P.2d 553 (1970), *cert. den.* 401 U.S. 942, 91 S.Ct. 947, 28 L.Ed.2d 223 (1971); *State v. Radabaugh,* 93 Idaho 727, 471 P.2d 582 (1970); *State v. Rodriguez,* 93 Idaho 286, 460 P.2d 711 (1969); *State v. Jiminez,* 93 Idaho 140, 456 P.2d 784 (1969); *King v. State,* 93 Idaho 87, 456 P.2d 254 (1969); *State v. Gonzalez,* 92 Idaho 152, 438 P.2d 897 (1968); *State v. Chaffin,* 92 Idaho 629, 448 P.2d 243 (1968); *Carey v. State,* 91 Idaho 706, 429 P.2d 836 (1967); *State v. Koho,* 91 Idaho 450, 423 P.2d 1004 (1967); *State v. Anstine,* 91 Idaho 169, 418 P.2d 210 (1966); *State v. Gish,* 87 Idaho 341, 393 P.2d 342 (1964); *State v. Clokey,* 83 Idaho 322, 364 P.2d 159 (1961); *State v. Burris,* 80 Idaho 395, 331 P.2d 265 (1958); *State v. Snowden,* 79 Idaho 266, 313 P.2d 706 (1957); *State v. Buchanan,* 73 Idaho 365, 252 P.2d 524 (1953); *State v. Owen,* 73 Idaho 394, 253 P.2d 203 (1953) (considered only in terms of crime committed and penalty imposed; overruled on substantive law point in *State v. Shepherd,* 94 Idaho 227, 486 P.2d 82 (1971); *State v. Pettit,* 104 Idaho 601, 661 P.2d 767 (Ct.App. 1983); *State v. Fenley,* 103 Idaho 199, 646 P.2d 441 (Ct.App.1982)).

674 P.2d 396 (1983) and *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983).

BISTLINE, Justice, concurring specially.

The complaint was filed September 12, 1983. Three months later, to the day, the trial commenced. A jury was selected and sworn shortly after 5:30 p.m. on December 12, 1983. The jurors were then excused until 9:30 a.m. on the 13th; it appears that they were not sequestered. At approximately 10:00 a.m. on Tuesday, December 13th, the trial commenced. All evidence was in and both sides rested on the next day—Wednesday, December 14th, shortly after 3:00 p.m. The jurors were excused, and not sequestered. At 10:42 a.m. on Thursday, December 15th, the jury was brought into the court room, and by 12:46 p.m. the jury had been instructed, counsel had summed up, and the jury sent out to consider its verdict—which required four hours. It was not a long or expensive trial. A second trial would probably consume less time.

It could have been an even shorter trial had the prosecution and the defense stipulated into evidence as evidence the newspaper accounts of the killing of Sterling Gene Grammer. There was little of important evidence introduced at trial which had not been previously produced in the newspapers, and likely by the television and radio broadcasters as well. Those accounts are in the record, having been offered as documentation supporting a motion for change of venue. Not just because the accounts were prejudicial to the defendant, but because those accounts stemmed primarily from the prosecuting attorney, the granting of the motion for a change of venue should have been granted. From my review of the record, the denial of that motion was the one error in otherwise errorless proceedings, other than the denial coupled with the non-sequestering of the jury leaves me with serious reservations about the latter ruling as well.

Nothing which I can find in the record satisfactorily explains the trial court's reasons and reasoning for not selecting the jury from elsewhere. The motion specifically was not one the granting of which would have moved the trial itself away from Canyon County, but would have entailed only that the trial judge and counsel go on the road only long enough to select a jury from the citizenry of another county which had not been so prejudicially subjected to such newspaper accounts.

The only explanation which surfaces for the denial is found in the transcript of pretrial motion hearings on November 28:

> MR. BISHOP: Your Honor, in regard to the motion for change of venue and/or jury selection, I believe it has been the practice of the Court in such requests to first attempt to acquire a jury, for the purpose of filing those motions and setting them, to preserve the right.
>
> COURT: Those motions will be denied without prejudice because the Court does examine at the time of trial concerning that.

On the morning of Tuesday, December 13th, after the jury had been selected on the previous day, defense counsel renewed the motion:

> COURT: I understand you have a motion, Mr. Bishop.
>
> MR. BISHOP: Your Honor, at this time the jury has been selected, and I would renew the motion for change of venue and would the cite the points and authorities which have been previously submitted.
>
> In addition, I would ask that the motion for exclusion of witnesses, which has already been granted, but I would ask that they be excluded at this time during the opening argument.
>
> COURT: I will deny the motion for change of venue.

Which sums up to the trial court's belief that if a jury can be obtained, that sufficiently dispels any reason for a change of venue. Justice Bakes, writing for today's majority, sees no error in the trial court's refusal to find jurors from another county, citing *State v. Brooks*, 103 Idaho 892, 655 P.2d 99 (1982), for the proposition that "waiver of peremptory challenges has been

found to indicate satisfaction with the panel." Conversely, so one would suppose, the exhaustion of peremptory challenges would establish dissatisfaction with the panel chosen. I do not agree with either postulate. Trial counsel, faced with the prospect that a change of venue has been denied in favor of the trial judge's determination and belief that he *can* produce a panel from the local citizenry, have to face up to the reality that an able judge so believing and so determined can do so, and will do so. At that point in time, experienced counsel will go with what they perceive to be the best of an entire lot who have been reading all about the prosecutor's iron-clad case against the guilty defendant. It is in order to observe some factors which the majority sees of no or little consequence. One, in what he termed preliminary remarks to voir dire examination the trial judge recognized (knew or was acquainted with) most of the potential jurors. Many of them had had prior criminal trial jury experience at the same term of court. Tr., Vol. 5, p. 6. Two, he then advised them that if he felt comfortable with the jury, the jurors would not be sequestered. Tr., Vol. 5, p. 8. Undoubtedly having gained their attention and confidence, he addressed them in a way which to my trial attorney's mind encouraged them to not admit to any preconceived notions of guilty because of what they had heard or read:

Another area that you're going to have to be thinking about is a question of whether or not you have read or heard anything about this case that would disqualify you from sitting as a juror. *The mere fact you might have read or heard something about this case does not disqualify you as a juror. If that were a fact in this society, we may have a tendency to eliminate all well-informed people.* That is not the purpose of it. We do want to have a good cross-section of the community. What does disqualify you is if you might have read or heard about this case and you have already formed some opinion that would take evidence to overcome that opinion. Now, from your experience in prior cases, you know in a criminal case the burden of proof is on the state of Idaho to prove the defendant in any case guilty beyond a reasonable doubt. The defendant in any criminal case enjoys the presumption of innocence, the right to remain silent. There is no burden upon the defendant to prove anything, so if you are in a position where you have formed an opinion or felt from what you read or heard that there was a leaning or a position that you have taken that would take evidence to overcome, then you're forcing the defendant to come forward with some type of evidence to rebut that evidence or feeling you have. That is contrary to the fundamental rights a defendant has, and you should not sit on this jury.

*Again the mere fact you have heard or read something about this case or any case does not disqualify you as a juror. We want well-informed people to sit as jurors.* Again, if you were the State of Idaho or the defendant, what they're looking for is a juror that hopefully would represent your present frame of mind that could sit in judgment of this case without any bias or prejudice. We cannot make a decision in any criminal case based on sympathy, any feeling of bias or prejudice. Those should be eliminated from your thinking. Tr., Vol. 5, pp. 10–12.

At the conclusion of the preliminary remarks the court itself opened the voir dire examination of the twelve jurors who had been seated:

COURT: Have any of you in the jury box talked to anyone who purported to know anything about this case, purported to have any personal information concerning this case?

(Whereupon juror Lorinda Norton raised her hand.)

COURT: I am not going to discuss that with you right now. However, from what you have heard, or what was discussed with you, have you formed any opinion about the innocence or guilt of the defendant without saying which way, just say yes or no, Mrs. Norton. Have

you formed an opinion about the guilt or innocence of the defendant that would take evidence to overcome? If you were the State of Idaho or the defendant, would you want a person in your present frame of mind to sit in judgment of this case?

MRS. NORTON: I don't think so, no.

COURT: Do counsel stipulate that Lorinda Norton may step down?

MR. HARRIS: The state would so stipulate.

MR. BISHOP: The defendant would agree, Your Honor. Tr., Vol. 5, p. 14. A George Solis took Linda Norton's seat but was excused because of a hearing problem. The court then asked the clerk to call out the name of another juror sitting in the box, a Mrs. Engum. Upon raising her hand and gaining the court's recognition, she sought a hardship excuse from jury duty, but was denied. David Knowlton was called to take the place of Mr. Solis. While he was being singly examined by the court, the court decided to shot-gun all of those then presently impaneled, which would be done with rather all-encompassing questions:

COURT: Has there been anything that we have discussed so far that creates a problem for you or you would like to respond to?

MR. KNOWLTON: No.

COURT: You have been a juror before?

MR. KNOWLTON: Yes.

COURT: There is no immediate pressing problems at home that you are going to be concerned about or worried about?

MR. KNOWLTON: No.

COURT: Have you talked to anyone who purported to know anything about this case?

MR. KNOWLTON: No.

COURT: I am going through these questions to the panel as a whole so I can ferret out any obvious disqualifications before we go to counsel to voir dire. *Have any of you read or heard anything about this case that has caused*

*you to form an opinion that would take evidence to overcome?*

(No response.)

COURT: None of you have expressed an opinion about the innocence or guilt of the defendant to any third person?

(No response.)

COURT: None of you have expressed an opinion about the innocence or guilt of the defendant to any third person?

(No response.)

COURT: Is there anyone seated in the jury box, going back to the question I read concerning the issue of the death penalty; is there anyone that has such religious or conscientious scruples that would prevent you from reaching such a verdict even though the evidence would warrant it?

(No response.)

COURT: Is there anything about the time element that would create any hardship, any undue hardship, not just hardship, but any undue hardship for any of you?

(No response.)

Tr., Vol. 5, pp. 19–20 (emphasis added). With the benefit of those remarks from the trial judge, it is not surprising that those prospective jurors in fairly good conscience were able to comply with the *Brooks* guideline of requiring only "the statement of each juror assuring their ability to objectively determine the issue of guilt or innocence on the facts presented in the trial." 103 Idaho at 898, 655 P.2d at 105. The *Brooks* Court observed that "A judge must be able to rely on such assurances in light of the pervasive influence of the free press in our daily lives." 103 Idaho at 898, 655 P.2d at 105. A parallel to that statement is that "a judge should be careful not to encourage those assurances." Here, we must remember that the judge was preparing the jurors for their examination by counsel, of whom only defense counsel had misapprehensions. Moreover, most trial attorneys of even limited experience have come to understand that many prospective jurors somehow have acquired the notion that it is wrong or in some manner unAm-

erican to have formed an opinion based on media reporting—and hence are inclined to not confess it.

With the stage so set, it is interesting to observe how the voir dire examination of defense counsel had been effectively rendered meaningless by the answers elicited on the court's prior examination of the jurors:

### VOIR DIRE EXAMINATION OF ERNEST ROSS

BY MR. FOUSER:

"Q. Do you know anything about the facts of this case other than what you heard in the courtroom today from Judge Lodge?

"A. Just what came out in the Caldwell Tribune. I live here in Caldwell.

"Q. Do you take the Press-Tribune?

"A. Yes, we do.

"Q. When was the last time you read anything about this case in the Press-Tribune?

"A. Well, this was in September, and I do harvesting, and lots of times I don't read the paper until—well, I don't get home until ten. As a matter of fact, I didn't read it the first time it came out in the paper, just later on, I did.

"Q. Tell us what you recall from what you read in the paper?

"A. Not really. When I did read the paper, it was 10:30 or eleven, and I just scanned through it a little bit, you know, all I did was just scan through it.

"Q. Would it be safe to say that from what you read you have not formed any opinion as to whether or not Don is guilty or innocent of the charges against him?

"A. No, I've not formed an opinion.

"Q. It has not influenced you in any way?

"A. No.

"Q. Would the fact that Don has been arrested and charged with this crime create in your mind *an inference or feeling he is probably guilty?*

"A. *No.*

"Q. *None of the news articles would create that inference?*

"A. *Not at all.*

"Q. Would you have any problem in giving him the full benefit of the presumption of innocence?

"A. I have no problem with that whatsoever.

"MR. FOUSER: I would pass Mr. Ross for cause.

. . . .

### VOIR DIRE EXAMINATION OF FLOYD COLLINS

BY MR. FOUSER:

"Q. You're a foreman for J.R. Simplot?

"A. Yes.

"Q. If you had to sit for five days as a juror in this matter, would that cause any hardship with your employment?

"A. It would just make the boss work more.

"Q. In other words, you're not going to worry about your work, but listen to the trial as it progresses?

"A. That's right.

"Q. What is your source of news? I understand you read a little bit about this case.

"A. Well, just the upcoming trial and the dates.

"Q. Did you read one of the local papers?

"A. Yes, the Press-Tribune paper.

"Q. Can you tell us what you know about the case from the paper?

"A. Well, just there is two people charged with the crime.

"Q. Do you recall any facts that might have been stated in the papers?

"A. Well, the date and stuff.

"Q. *What the papers may have said took place?*

"A. *Well, the guy was killed and robbed, and his body was dumped in the river.*

"Q. *How will that influence you as a juror?*

"A. *I don't think it will.*

"Q. You would be able to put that out of your mind and listen to the evidence, base your decision only on what you hear in the courtroom rather than what you have read in the past?

"A. Right.

"Q. Can you promise us you could do that?

"A. You bet.

"Q. Would you be able to judge this case on the facts before you and not let fear of criticism affect you?

"A. Well, that's all we could do, is judge it on the facts.

"Q. You would not be afraid of what someone might say after it was all over?

"A. No.

"Q. Would the fact that the defendant Don Fetterly was at the scene where this killing took place infer in your mind that he was guilty of first-degree murder?

"A. No, not just that fact, no.

"MR. FOUSER: No further questions, thank you.

. . . .

## VOIR DIRE EXAMINATION OF HAZEL DAVENPORT

BY MR. FOUSER:

"Q. Good morning. Do you have strong feelings about any of the crimes that Don is charged with that would affect your ability to sit as a fair and impartial juror?

"A. No.

"Q. Have you read anything about this case or heard anything on the news media other than what Judge Lodge has told you this morning?

"A. I've not heard much.

"Q. Have you heard some?

"A. Well, just what came out several months ago. But really, I can't remember about it. Just what I heard.

"Q. Do you recall anything about what you heard about the case, can you tell me anything you heard?

"A. Well, I believe it's a case where there was a man murdered in Caldwell, and that's all I know, and he was found in the river.

"Q. Would the fact you read this or heard this make you think that Don is probably more likely guilty than not guilty?

"A. No, sir. I would want to hear both sides.

"Q. Would you require us at any time to prove to you that Don is innocent?

"A. No.

"Q. You understand that the burden of proof is solely on the prosecuting attorney?

"A. Yes.

"Q. And that if he doesn't prove every element of the crime and the judge will instruct you on the elements of the crime, beyond a reasonable doubt, that you would have to acquit Don?

"A. Yes.

"Q. Are you related to Mel Davenport?

"A. No, sir.

"MR. FOUSER: I don't believe I have any further questions. Thank you.

. . . .

## VOIR DIRE EXAMINATION OF DAVID KNOWLTON

BY MR. FOUSER:

"Q. I have talked with you before, and I know the answers to most of the questions you have given in the past, but I am curious. *What, if anything, do you know about this case from the news? You said you didn't know much. Do you know anything?*

"A. *No.*

"Q. You have not heard anything on the radio or TV?

"A. No.

"Q. You realize that all of the elements of the crime must be proven beyond a reasonable doubt before you could convict on the crime charged, don't you?

"A. Yes.

"Q. Knowing the charge against Don, that is, first-degree murder and burglary and theft charge, would any of those present a problem for you; that is, create an inference in your mind that there must be something to it or he wouldn't be charged?

"A. No.

"Q. So you would be able to hear the case with an open mind and fairly consider the evidence?

"A. Yes.

"MR. FOUSER: We would pass Mr. Knowlton for cause.

. . . .

## VOIR DIRE EXAMINATION OF DANIEL ROHRBACHER

BY MR. FOUSER:

"Q. Good morning, Mr. Rohrbacher. You said you read something in the paper yesterday?

"A. Well, there was a short excerpt in the paper. I'm not sure if it was this one. It had to do with the district court was going to be holding two trials, and I assume it would be this one and another one.

"Q. Was that in the Press-Tribune?

"A. I believe it could have been in the Statesman. That might have been in the Statesman paper. I don't know. There was just this one article I read stating the district court was going to be held and there were two cases that were going to be tried, and that was about it.

"Q. Other than that, to your recollection, do you recollect reading anything about this particular case?

"A. No. I wasn't that familiar with it, sir.

"Q. Knowing the charges against Don, that is, first-degree murder, the most important charge, at least; would you have any problems in giving him a fair and impartial trial—

"A. On that charge?

"Q. Yes.

"A. No, sir.

"Q. The fact he has been charged or accused of a crime and brought to trial, does that create an inference there might be something to it, such as where there's smoke there's fire?

"A. Well, no; as far as I'm concerned he is innocent at this time; let me put it that way.

"Q. You will be able to judge this case solely on the facts and evidence produced here in this courtroom and nothing else, nothing that you might have heard or read?

"A. Right. I can do that.

"MR. FOUSER: Thank you, Mr. Rohrbacher. We would pass Mr. Rohrbacher for cause, Your Honor.

. . . .

## VOIR DIRE EXAMINATION OF VERNON HOAGLAND

BY MR. FOUSER:

"Q. Mr. Hoagland, you said you read a little bit about this in the papers or heard something about the case. Can you remember anything specifically that you read or heard?

"A. Well, it's been so long ago. I probably forgot what it was.

"Q. You have not read anything?

"A. Well, other than that little article that was in the Press-Tribune that I told you about.

"Q. Yes. Do you recall anything from that article?

"A. Not specific.

"Q. How about any facts that might have been stated or purported facts?

"A. No.

"Q. You just glanced over it?

"A. Yes.

"Q. So it would be safe to say at this point you have not formed any opinion one way or the other about this case?

"A. No.

"Q. Is there anything about the background that you feel would make it hard for you to give Don a fair and impartial trial?

"A. I don't believe so.

"Q. If you felt that, say you were in the minority and other jurors were all voting one way, do you think you would be able to stick by your guns and try to sway them over if you felt you were in fact right?

"A. I'm pretty stubborn.

"Q. That's what we are looking for. I would pass Mr. Hoagland for cause.

. . . .

## VOIR DIRE EXAMINATION OF EUGENE WINTERS

BY MR. FOUSER:

"Q. You have been a juror before?

"A. Yes.

"Q. How many times in this term have you sat as a juror?

"A. Two times.

"Q. Were these both criminal cases?

"A. No.

"Q. One was civil, or both were civil?

"A. One was a DWI and the other was harboring a fugitive.

"Q. I suppose from that experience you understand that the prosecuting attorney has the burden of proving Don guilty beyond a reasonable doubt?

"A. Yes.

"Q. You are aware there are certain elements to each crime, each of which must be proven beyond a reasonable doubt. Do you remember that from your other trials?

"A. Yes.

"Q. If one of the elements of this crime of first-degree murder were not proven to you beyond a reasonable doubt, would you have any hesitancy in returning a verdict of not guilty?

"A. No, I don't believe so.

"Q. I don't want to tell you the elements because that's the judge's job, but I'm sure there will be some instructions given to you on that. Have you read anything in the papers about this case?

"A. Well, a little bit.

"Q. Do you remember anything you have read about it?

"A. Only that they was going to have a trial. I read a piece the other day in the paper. I guess most everybody did. We don't take the paper, but I did read a piece about it in the paper. ·

"Q. *Did you read anything about the facts of the case in the paper; what they said might have been done or taken?*

"A. *Well, they didn't present any evidence in the paper.*

"Q. Was that yesterday?

"A. Yes, I believe it was Sunday.

"Q. But at any rate, you would not have any problem giving Don a fair and impartial trial?

"A. No, I don't know why I would.

"Q. You would not require him to prove that he is innocent, would you?

"A. Well, all I would have to go on is what the Court presented to me as evidence. That;'s all we can go on.

"Q. What I'm getting at is you understand that we have no duty to prove that Don is innocent; that the whole duty or burden is on the prosecutor to prove him guilty?

"A. Yes, I understand that.

"MR. FOUSER: Thank you. I would pass Mr. Winters for cause.

. . . .

## VOIR DIRE EXAMINATION OF EVELYN JOHANSEN

BY MR. FOUSER:

"Q. You enter into this case knowing pretty much only what the judge has told you in court this morning?

"A. Yes.

"Q. As you know, there are certain elements to each crime, all of which must be proven beyond a reasonable doubt?

"A. Yes.

"Q. You have no problem with that, making sure that each element is proven?

"A. That's right.

"Q. Would the nature of this case, a first-degree murder case, make it hard for you to sit as a fair and impartial juror?

"A. No, I don't think so.

"Q. You would not require us or Don to prove to you that he is innocent of the charges, would you?

"A. No.

"MR. FOUSER: Thank you very much. I would pass Mrs. Johansen for cause.

. . . .

## VOIR DIRE EXAMINATION OF MARY HENNIS

BY MR. FOUSER:

"Q. Hello, Mary. How many times have you been a juror?

"A. How many?

"Q. Yes.

"A. Twice.

"Q. Is there anything from those experiences that would make it hard for you to be a fair and impartial juror in this case?

"A. No.

"Q. Do you have strong feelings about this crime; that is, first-degree murder, that would make it hard for you to be a fair and impartial juror?

"A. No.

"Q. *Would the fact that Don has been arrested and charged and brought before the Court, they've charged him with first-*degree murder, create in your mind an inference there must be something to it?

"A. *Well, I will have to listen to the facts, I guess.*

"Q. You would listen to the facts, I assume from your answer to Mr. Harris's questions, and not let anything you heard outside of the courtroom influence you?

"A. That's right, I wouldn't.

"Q. You have not formed any opinion, I take it, from anything you might have heard or read?

"A. No.

"MR. FOUSER: Thank you. I pass Mrs. Hennis for cause.

. . . .

## VOIR DIRE EXAMINATION OF CLYDE FILLMORE

BY MR. FOUSER:

"Q. Mr. Fillmore, I know you're a farmer. have you gotten everything taken care of for this year?

"A. Well, farmers don't do much work this time of the year in the fields.

"Q. There are no chores around the place that require you to be home?

"A. Well, I'm a row crop farmer, and I have no livestock, so it's taken care of, yes.

"Q. Is there anything about the charge, this being a first-degree murder, that would make it difficult for you to sit as a fair and impartial juror?

"A. The nature in regard to the death penalty?

"Q. No, just that it is a first-degree murder charge?

"A. I don't think so.

"Q. I know you have stated you would follow the instructions as Judge Lodge would give them to you. You don't think you would have a problem with that, do you?

"A. I don't think I would have a problem with that.

"Q. At the very first Judge Lodge read off three charges against the defendant. Do you understand that each one of those charges must be tried and proven beyond a reasonable doubt? What I'm saying is it's not all or nothing, but each charge must be proven beyond a reasonable doubt.

"A. I was not aware of that, but yes, I understand it.

"Q. Do you have any problem with that?

"A. None other than what I've already stated.

"Q. So at this point you understand it is not an all-or-nothing proposition? He could be exonerated on some and found guilty on others?

"A. Yes.

"Q. Do you think if you would reach an opinion that was different, say, than the other eleven jurors, would you be able to stand by that opinion if you felt an abiding conviction, if you had reached your decision and felt it a correct decision?

"A. Yes.

"Q. You would be able to listen and freely discuss with the other jurors their feelings on the case, I assume?

"A. Yes.

"MR. FOUSER: We would pass this juror for cause.

. . . .

### VOIR DIRE EXAMINATION OF AGNES ENGUM

BY MR. FOUSER:

"Q. Mrs. Engum, do you know anything about this case other than what you have heard in the courtroom here today?

"A. I don't know anything about it. I don't read the papers.

"Q. Have you seen anything on TV about it?

"A. No, I've not paid that much attention.

"Q. Judge Lodge explained earlier there are three charges against Don; murder, first-degree murder; burglary; and grand theft. Do you understand that each one of those charges has to be considered separately when you go to the jury room and deliberate?

"A. Yes.

"Q. It is possible that maybe you would find him guilty of one of the offenses but yet not find him of two or any other combination?

"A. Yes.

"Q. Would you require Don to prove to you that he is innocent of these charges?

"A. No, I think the evidence you have to go by.

"Q. You understand that it is the burden of the prosecuting attorney to prove all of the accusations he has made beyond a reasonable doubt?

"A. Yes, I understand that.

"Q. You have been a juror before?

"A. Yes, two times.

"Q. From that experience, I'm sure you realize that a defendant has no burden of putting on any evidence if he so chooses?

"A. Yes, I was on one that was that way.

"Q. Does that make you think that the defendant is more likely than not guilty because he does not testify?

"A. No.

"Q. And I guess that the ultimate issue is if you can follow Judge Lodge's instructions carefully, do you promise us you will do that?

"A. Yes.

"MR. FOUSER: I will pass this juror for cause. Tr. Vol. 5, pp. 37–78 (emphasis added).

Such was the end of the first round of examining the jurors. Defense counsel was not able to mount a single challenge for cause, and might just as well have foregone the exercise.

Following the state's first peremptory challenge, another juror was called and examined, *but first by the court:*

## VOIR DIRE EXAMINATION OF
## ELVIS COMER

BY THE COURT:

"Q. Mr. Comer, you have had prior jury duty, have you not?

"A. Yes.

"Q. Was that both criminal and civil?

"A. Criminal.

"Q. Were you in a position this morning to hear the questions that were asked by the Court?

"A. Yes.

"Q. Is there anything about any of those questions that would cause you any reason at all to feel you could not be a fair and impartial juror?

"A. No.

"Q. Have you talked to anyone who purported to know anything about this case?

"A. I have talked to no one, but I have seen on television and in the papers and all of that.

"Q. *From what you have read or have seen in the news media, have you formed an opinion or taken a position that would cause the defense to have to produce evidence to overcome that feeling or opinion?*

"A. *No, I don't believe I have formed an opinion on this from the news media and television.*

"Q. Whatever you might have read or heard, you understand that is just the news media?

"A. Yes, it's just the news.

"Q. It is not something you can base any factual opinions on?

"A. Yes, I understand.

"Q. At the same time, even though we know that to be true, sometimes when we read or hear something, it does cause us to believe it until we hear evidence the other way. You do understand that a defendant in a criminal case is presumed to be innocent?

"A. Right.

"Q. You understand that the defense does not have the burden of proving anything. The burden is entirely on the State of Idaho.

"A. Yes.

"Q. So if we have an opinion or are waiting for the defendant to disprove something, then we are not affording him the presumption of innocence he rightfully deserves?

"A. That's right.

"Q. Now, do you think that you could set aside anything that you might have heard prior to coming into court today and base your decision only on the evidence that is presented in this courtroom?

"A. Yes.

"Q. Would you want a person in your present frame of mind to sit in judgment in this case if you were the defendant or the state?

"A. Definitely. I believe I would.

"Q. Did you hear the statement I read this morning concerning the death penalty?

"A. Yes.

"Q. If the evidence warranted a finding of first-degree murder, could you return a verdict, or do you have any religious or conscientious scruples that would prevent you from returning that verdict?

"A. No.

"Q. Do you know any of the witnesses we mentioned that might testify in this case?

"A. Yeah, the two that discovered the body.

"Q. What were their names?

"A. The Kalousek brothers.

"Q. Have you talked with either one of them?

"A. No, I've not seen them for years, but they used to be close neighbors years ago.

"Q. If they were to testify, do you think that your past knowledge or friendship might cause you to give greater credence to their testimony than to some other wit-

ness that might testify concerning the same facts?

"A. No.

"Q. Did you just know them, or were they personal acquaintance?

"A. Years ago they lived pretty close. I knew them real well. But as time travels on—

"Q. Taking into consideration not only what we have discussed in past jury trials, but what I have talked about this morning and having examined your own conscience concerning your responsibilities as a juror, do you know of any reason you could not sit as a fair and impartial juror in this matter?

"A. No.

On examination by defense counsel:

## VOIR DIRE EXAMINATION OF ELVIS COMER

BY MR. FOUSER:

"Q. You said you heard a little bit about this case outside of the courtroom, or read about it. Can you recall anything you read?

"A. Well, mostly on these two guys that found the body.

"Q. That is about all you remember?

"A. That's mostly what I remember, because I know the two guys that found him.

"Q. Do you recall any of the purported facts in the paper? Do you remember any of that about what might have taken place?

"A. Well, not too much, but a little. There was—do you want me to tell you about it?

"Q. Sure, tell me what you remember.

"A. Well, they found the pickup and that part of it. There was supposed to be a television in the pickup, and I guess that about covers it.

"Q. Was there anything about how the paper might have described any statements made or anything like that?

"A. The only thing I remember now is the area where it was found.

"Q. Well, does any of this stuff you heard outside of the courtroom create in your mind that Don is more likely guilty than not guilty?

"A. Outside of the courtroom I've never discussed it where I have been, you know. We've never talked about it. I don't know if nobody else knew about it. I never brought it up. Nobody else ever did.

"Q. *What about in your own mind, from what you have heard? Have you formed any opinions?*

"A. *Not really.*

"Q. *Do you think that the fact that Don is being charged with first-degree murder makes you think maybe there is something to it?*

"A. *Well, yes, I do.*

"Q. That is a natural feeling, of course. You understand at this time he is presumed to be innocent?

"A. That's right.

"Q. Can you do that? Can you give him the presumption of innocence?

"A. I believe I can.

"Q. Is there anything about the nature of the charge that is a first-degree murder charge, that would make it difficult or hard for you to be impartial?

"A. I don't think so.

"Q. Do you think you are the kind of person that could stand up for your own feelings, say, if the eleven jurors disagreed with you and you knew you were right?

"A. I believe I could. They would have a tough time.

"MR. FOUSER: No further questions. I pass Mr. Comer for cause.

Skipping more than a hundred pages of much of the same to two of the last three jurors examined:

## VOIR DIRE EXAMINATION OF LOREN WHELCHEL

BY THE COURT:

"Q. Mr. Whelchel, have you been a juror before?

"A. Yes, sir.

"Q. In both civil and criminal?

"A. Both.

"Q. So you have a pretty good idea of the responsibilities as a juror?

"A. I have a pretty good idea, yes.

"Q. Taking that into consideration along with the questions I asked this morning, would your answers have been any different than what the panel as a whole responded this morning?

"A. No, it shouldn't be any different. I can be fair and impartial.

"Q. Do you have any religious or conscientious scruples that would prevent you from ever returning a verdict of guilty of first-degree murder, even though the evidence warranted the same?

"A. As long as it was concrete evidence.

"Q. You would follow the instructions on that given by the Court, whether you personally agreed with it or not?

"A. I would do that, sir.

"Q. Have you talked to anyone that purported to know anything about this case?

"A. Not yet.

"Q. *Have you read in the news media or read or heard on television something that would cause you to have formed an opinion or feeling in this matter that would take evidence to overcome?*

"A. No, sir.

"Q. You truly believe in the presumption of innocence and the fact that the defendant has the right to remain silent?

"A. I believe in that, sir.

"Q. You know that the state has to prove the defendant guilty beyond a reasonable doubt. Do you have any problem with that concept?

"A. No problem, sir.

"Q. Have you read or heard anything about this case?

"A. Not to my knowledge, I have not. I don't read much of the newspaper.

. . . .

## VOIR DIRE EXAMINATION OF GLORIA GONZALES

BY THE COURT:

"Q. Mrs. Gonzales, you have been a juror before?

"A. Yes.

"Q. Has that been on both civil and criminal cases?

"A. No, just criminal.

"Q. You're familiar, then, with your responsibilities and obligations as a trial juror in a criminal case.

"A. Yes, sir.

"Q. *Taking that experience into consideration, along with the question which I asked of the panel as a whole this morning, was there anything about those questions that would have caused you to have responded differently than the panel as a whole?*

"A. No.

"Q. Do you have any religious or conscientious scruples that would prevent you from ever returning a verdict of first-degree murder, even if the evidence warranted the same?

"A. No.

"Q. *Have you read, heard, or seen in the news media anything that has caused you to form an opinion or feeling that would take evidence to overcome?*

"A. No.

"Q. Have you read or heard anything about this case?

"A. I'm sure I read something. I vaguely remember hearing something. I was in the kitchen doing something else, but I remember something about arraignment. But I'm not sure. I was doing other things, so I was half-listening.

"Q. If we were proceeding through the evidence and there were something that would cause you to reflect back to some-

thing you read or heard, do you feel you could set that aside and base your decision completely on what you heard in this courtroom?

"A. Yes. Tr., Vol. 5, pp. 207–217 (emphasis added).

A criticism which might be leveled at the *Brooks* "assurance" statement as utilized by the majority is that the "free press" in this case was merely reporting that which was being spoon-fed to it by the prosecutor, and by other law enforcement people who could have been tempered down had the prosecutor been of a mind to caution them. With that in mind, the stage is set to examine the articles which made for a "well-informed people to sit as jurors"—all of which are attachments to the motion seeking a venire of jurors from some county other than Canyon—and, also one would think, counties other than Canyon which had not been subjected to the same intensity of exposure to media reporting:

### 2 ordered tried for murder in slaying of Caldwell man

#### By DOUG PEEPLES

The Idaho Statesman

CALDWELL—Two suspects in the Sept. 7 slaying of Sterling G. Grammer of Caldwell were bound over for trial on Wednesday, while their attorney said he would ask for a change of venue.

In a preliminary hearing, 3rd District Magistrate Jack Swafford bound over Donald Fetterly, 26, and Karla Windsor, 27, on charges of first-degree murder, first-degree burglary, grand theft and use of a deadly weapon. Swafford closed the hearing to the public at the request of defense attorney Van Bishop.

Bishop said after the hearing that he intends to ask that a jury be selected from outside Canyon County because of pretrial publicity—which included reports quoting County Prosecutor Richard Harris as saying a confession had been obtained from Fetterly and Windsor.

Bishop said he was not ordinarily concerned about pretrial publicity, but added,

"Generally, the entire investigation appeared to be revealed, even to the point of how it (the crime) allegedly took place."

Bishop said it would be difficult for a jury chosen from Canyon County to remain impartial in the face of the amount of information that has been revealed about the case.

Harris said the suspects' confession has been "absolutely corroborated" by a subsequent investigation. "It nails them to the wall," Harris said.

Fetterly and Windsor were arrested Sept. 10, the day after Grammer's body was found floating in the Snake River six miles downstream from Walters Ferry. Grammer had been stabbed five times and his face, arms and legs wrapped with duct tape, deputies said.

Fetterly and Windsor originally were charged with first-degree murder, robbery and use of a deadly weapon. Harris said the robbery charge was dropped for lack of evidence.

If a change of venue were granted by the court the trial would not be moved, but jurors would be called in from outside Canyon County, Bishop said.

Bishop said he will file a motion soon to reserve the right to ask for a change of venue. He said he would not ask for a hearing on the motion to be held until some time close to the trial, when he can get a better measure of the impact of publicity on the case.

Fetterly and Windsor remained in custody in the Canyon County jail without bail.

### Murder trial set in killing of Caldwellite

#### By DOUG PEEPLES

The Idaho Statesman

CALDWELL—Two suspects in the Sept. 7 slaying of Sterling G. Grammer of Caldwell were bound over for trial on Wednesday, while their attorney said he would ask for a change of venue.

In a preliminary hearing, 3rd District Magistrate Jack Swafford bound over *Don-*

ald *Fetterly*, 26, and *Karla Windsor*, 27, on charges of first-degree murder, first-degree burglary, grand theft and use of a deadly weapon. Swafford closed the hearing to the public at the request of defense attorney Van Bishop.

Bishop said after the hearing that he intends to ask that a jury be selected from outside Canyon County because of pretrial publicity—which included reports quoting County Prosecutor Richard Harris as saying a confession had been obtained from Fetterly and Windsor.

Bishop said he was not ordinarily concerned about pretrial publicity, but added, "Generally, the entire investigation appeared to be revealed, even to the point of how it (the crime) allegedly took place."

Bishop said it would difficult for a jury chosen from Canyon County to remain impartial in the face of the amount of information that has been revealed about the case.

Harris said the suspects' confession has been "absolutely corroborated" by a subsequent investigation. "It nails them to the wall," Harris said.

Fetterly and Windsor were arrested Sept. 10, the day after Grammer's body was found floating in the Snake River six miles downstream from Walters Ferry. Grammer had been stabbed five times and his face, arms and legs wrapped with duct tape, deputies said.

Fetterly and Windsor originally were charged with first-degree murder, robbery and use of a deadly weapon. Harris said the robbery charge was dropped for lack of evidence.

### Two arraigned on charges of murder, theft

#### By DOUG PEEPLES

#### The Idaho Statesman

CALDWELL—Two suspects arrested Saturday in the slaying of 45-year-old Sterling G. Grammer were arraigned Monday on charges of first-degree murder.

Donald K. Fetterly, 26, and Karla Y. Windsor, 27, were arrested and charged with the murder Saturday afternoon after police said they spotted them driving Grammer's pickup truck.

The two also were charged with robbery and with use of a deadly weapon in commission of a felony. The latter charge could be used to add time to their sentences if Fetterly and Windsor are convicted of the other charges.

Fishermen on Friday found the body of Grammer, 1201 E. Elgin St., Caldwell, floating in the Snake River, six miles downstream from Walters Ferry.

During the hearing, Fetterly also was served with a warrant from Twin Falls County charging him with writing a check with insufficient funds. No action was taken on that charge.

Third District Magistrate Judge Marvin Cherin set a preliminary hearing on the murder and robbery charges for Sept. 21 and ordered the pair returned to Canyon County Jail. Assistant Public Defender Scott Fowzer did not request release of the two suspects on bond.

Both suspects, who lived together in Caldwell, were recently released on bond and were awaiting an Oct. 4 trial on a misdemeanor charge of fraudulent use of a credit card.

Police said earlier that Fetterly and Windsor had met Grammer two weeks before the murder.

Dick Appleton, operations officer for the Canyon County Sheriff's Department, said Saturday that the pair were at Grammer's home when he returned early Wednesday morning. Appleton said Grammer was stabbed after a struggle ensued while he was being tied up with duct tape.

The victim was stabbed five times, including once in the heart, according to Caldwell Police Sgt. Allen Records, detective division supervisor.

Records said Grammer's wife, Rosalie Grammer, filed a missing report on her husband Friday after he failed to stop for a daily visit with his 4-year-old son. The Grammers have been separated for 18

months, but Grammer was strongly attached to their young son and visited him daily, according to the missing-person report.

The report said Rosalie Grammer became more suspicious after Grammer's supervisor at Kit Manufacturing called her Friday and said he had not seen Grammer since the previous Tuesday.

Later Friday, she saw her husband's pickup truck with one man and two women in it on South Kimball Road, the report said.

### Murder suspects just got out of jail

#### By MICHAEL ZUZEL

#### The Idaho Statesman

CALDWELL—Two suspects arrested Saturday in connection with the death of a 45-year-old Caldwell man had been released on bond from the Canyon County Jail several days before the slaying, officials said Sunday.

Donald Fetterly, 26, and Karla Windsor, 27, who were arrested on first-degree murder charges in the death of Sterling Grammer, 1201 E. Elgin St., had been in jail on charges of fraudulent use of a credit card, Canyon County Prosecuting Attorney Richard Harris said.

The suspects will be arraigned on the murder charges at 2:30 p.m. today in Canyon County Magistrate Court, Harris said.

He said the pair had been released on bond less than two weeks ago. Both were to have appeared in court on Oct. 4 on the credit-card charge, he said.

Harris said he was not sure exactly when Fetterly and Windsor had been arrested on the credit-card charge, nor how long they were in custody before being released.

Harris said both Fetterly and Windsor were unemployed and were living together in Caldwell. He said Fetterly has "a long, extensive (criminal) record ... mostly burglary-type stuff."

Fetterly and Windsor were apprehended about 2 p.m. Saturday on Nampa's southwest side while driving in a pickup truck

belonging to Grammer, Canyon County Sheriff John Prescott said.

On Friday, two fishermen found Grammer's body floating in the Snake River, six miles downstream from Walters Ferry. The body had been bound at the wrists and ankles with duct tape; tape also had been wrapped around the head, nose and mouth, police said.

An autopsy conducted Saturday morning showed that Grammer, an employee of Kit Manufacturing Co., died as the result of stab wounds to the heart and upper body, Prescott and Harris said.

Police believe a buck knife belonging to Grammer was used in the slaying, Harris said. Police recovered the knife from the victim's 1970 Chevrolet Impala sedan, he said.

Police took statements from the suspects after their arrest and believe robbery was the motive in the killing, Harris said.

"There are still some things that, based on what they (Fetterly and Windsor) have told us, don't quite square with the physical evidence," Harris said. "For the most part, their story corroborates the physical evidence."

Police believe the pair had met Grammer about two weeks before the murder, had been to his home and seen his belongings, sheriff's Operations Officer Richard Appleton said.

According to Appleton, the pair were at Grammer's house when he returned early Wednesday morning. A struggle resulted, and Grammer was stabbed to death, Appleton said.

Police believe the body was left in the house until Wednesday night, when it was wrapped up and dropped off a boat ramp into the Snake River, Appleton said.

A television set, a stereo, a clock-radio and other items were taken from Grammer's house, Prescott said.

When they were captured, Fetterly and Windsor were driving Grammer's 1970 Chevrolet pickup truck, Prescott said. The truck's camper shell and the car in which

the knife were found had been left with friends of the suspects, he said.

No further arrests were contemplated in connection with the slaying, Prescott said Sunday.

### Suspects arrested in slaying

#### By MIRIAM BARR

The Idaho Statesman

CALDWELL—Two Caldwell residents were arrested Saturday in the slaying of 45-year-old Sterling Grammer of Caldwell. Authorities said robbery was a motive in the crime.

Karla Windsor, 27, and Donald Fetterly, 26, were driving Grammer's pickup truck when they were arrested about 2 p.m. Saturday at a roadblock at Midland Boulevard and Lake Lowell Avenue, on Nampa's southwest side, Canyon County Sheriff John Prescott said. Windsor and Fetterly were booked on charges of first-degree murder in the death of Grammer, 1201 E. Elgin St., Prescott said.

Grammer's body, bound at the wrists and ankles with duct tape, was found floating in the Snake River on Friday.

Windsor and Fetterly will be arraigned at 2:30 p.m. Monday in Canyon County Magistrate Court, Prosecuting Attorney Richard Harris said.

After interviewing each suspect, Richard Appleton, the sheriff's operations officer, said authorities believe the following took place:

The couple had met Grammer about two weeks before, and had been to his home and seen his possessions, Appleton said.

Grammer's home was broken into Tuesday night while he was away, Appleton said. When he returned Wednesday morning two people confronted him and said they wanted some of his property, Appleton said.

The assailants were armed with a knife, Appleton said.

To give the appearance of robbery, Grammer agreed to be tied up while the assailants removed some of his posses-sions, Appleton said. But while Grammer was being bound, he apparently changed his mind and started to struggle, Appleton said.

At that point the assailants stabbed him several times, at least once fatally in the heart, Appleton said.

Prescott and Harris told reporters at a briefing that an autopsy conducted Saturday morning determined that Grammer was killed by stab wounds in the heart and the upper part of the body.

Harris said there were several other lacerations on the body and that one lung was perforated. He said there was a bruise on Grammer's left temple and a bruise on the right side of his face.

Appleton said authorities believe the assailants left Grammer's body in his house all day Wednesday and returned that night. Authorities also believe they wrapped the body and took it to a boat ramp on the Snake River about six miles downstream from Walters Ferry, where they put the body in the river, Appleton said.

Two fishermen were near the boat ramp when they saw the body, still fully clothed, drifting three feet from the riverbank about 9:30 a.m. Friday, Appleton said.

Prescott said Windsor and Fetterly were driving Grammer's 1970 Chevrolet pickup, minus its camper shell, when they were stopped by officers Saturday afternoon. He said the truck's camper shell and Grammer's 1970 Chevrolet Impala sedan had been left with friends of the suspects.

The sheriff said several articles from Grammer's home were seen in the truck, but that officers had not had time to inspect it. A television set, stereo, clock radio and other items were taken from Grammer's house, Prescott said.

He said no guns, knives or other weapons were visible in the pickup.

Prescott said the pickup was seen by several people who contacted officers while it was being driven around Canyon County between Wednesday and Saturday.

Minnie and Sam Lydick, Grammer's landlords, said Grammer had lived in one of their apartments for about two years.

Mrs. Lydick said Grammer lived alone and had very few visitors. She described him as a "nice quiet person" who "kept to himself."

She said Grammer and his wife were separated. The Grammers had three sons, twins Ronald and Robert, 17, and Kevin, 4½, Appleton said.

Lydick said Grammer was a hard-working man.

"I've seen him go to work when he was too sick to," she said. "He was a man who would help anyone if he thought they needed help."

**Sterling Grammer**

had lived alone

**Karla Windsor**

to be arraigned Monday

**Donald Fetterly**

was stopped at roadblock

### Grammer slaying arraignment held

By Kevin Hackett

Idaho Press-Tribune

A Sept. 21 preliminary hearing date was set Monday for a Caldwell couple accused of murdering a Caldwell man last week and later dumping his body into the Snake River.

Donald Kenneth Fetterly, 26, and Karla Yvonne Windsor, 27, were formally charged with first-degree murder and robbery at an arraignment before Magistrate Marvin Cherin. Accompanying charges of committing a felony with the use of a deadly weapon were also filed against the pair.

Cherin appointed the county public defender to represent the suspects. Public Defender Scott Fouser, who was present at the arraignment, told Cherin he wasn't ready to make a motion concerning bail for the couple.

Fetterly was also served an outstanding warrant out of Twin Falls County. A charge of writing a check with insufficient funds has been filed against Fetterly there. No action was taken on the warrant.

Fetterly and Windsor are charged in connection with the Sept. 7 stabbing death of Sterling Gene Grammer, 45, 1201 E. Elgin St. Police said Grammer died after he was stabbed several times in the chest with a short-bladed knife at his residence at about 9 a.m.

Grammer's body, bound at the wrist and ankles and the head wrapped with duct tape, was discovered last Friday by two fishermen in the Snake River, about six miles downstream from the Walters Ferry Bridge.

Fetterly and Windsor were arrested by police Saturday in southwest Nampa after they were spotted driving Grammer's pickup.

Canyon County Sheriff's Office Operations Officer Dick Appleton said Saturday the suspects told investigators they entered Grammer's residence while he was away Tuesday night. Grammer was slain the following morning after he returned to the residence.

Fetterly and Windsor were also formally charged Monday with taking two rings, a television, stereo, radio and .22 caliber pistol from Grammer's residence. All of the items were recovered by police at the time of the suspects' arrest.

Both suspects told Cherin they are currently unemployed. Fetterly said he last worked two months ago on a ranch in Nevada.

### Two refuse to enter pleas in slaying of Caldwell man

CALDWELL—The two defendants in the murder last month of a Caldwell man refused to enter pleas at their 3rd District Court arraignment Friday.

District Judge Edward J. Lodge entered innocent pleas for Donald K. Fetterly and Karla Y. Windsor, and set a tentative trial date of Dec. 12.

Fetterly, 26, and Windsor, 27, are charged in the Sept. 7 slaying of Sterling G. Grammer of Caldwell. A trial was tentatively scheduled for Dec. 12.

"I'm just gonna take the Fifth on that, I'm not sayin' nothin'," Fetterly said when 3rd District Judge Edward Lodge asked for his pleas to charges of first-degree murder, first-degree burglary and grand theft.

The Fifth Amendment to the Constitution protects a defendant from self-incrimination. Canyon County authorities say they obtained confessions from Fetterly and Windsor shortly after their arrest.

Fetterly also refused to give a plea to a related but separate charge of use of a deadly weapon in the commission of a crime.

Grammer, 45, was found floating in the Snake River on Sept. 9, his body bound with duct tape. Fetterly and Windsor were arrested the following day.

Fetterly and Windsor were returned to the Canyon County Jail after the arraignment.

In connection with the foregoing, the actions of the magistrate who conducted the preliminary hearing are to be noted. He held a *closed* hearing. When it was concluded he ordered the proceedings *sealed*. The only document to surface from his office was the order filed in district court binding over Fetterly and Windsor for trial in district court. Meanwhile, the prosecutor had begun his move toward obtaining "a well-informed people to sit as jurors."

While I do not disagree with Justice Bakes wherein, relying on *State v. Bainbridge*, 108 Idaho 273, 698 P.2d 335 (1985), he declares that the Court will consider affidavits giving opinion as to prejudice created by pretrial publicity, I do not agree that affidavits are in fact mandated, if such be the tenor of his argument. One could, it might be supposed, also require opinion affidavits as to prejudice that would or might result to a defendant when in a joint trial at which his nontestifying co-defendant's confession is admitted in evidence, much of which implicates the defendant. For those who would so consider, I invite attention to *State v. Beam*, 109 Idaho 616, 710 P.2d 526 (1985).

Just as the United States Supreme Court remarked in *Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 1622–23, 20 L.Ed.2d 476 (1968), on the *substantial risk that the jury, despite instructions to the contrary*, looked to the incriminating extra-judicial statements in determining petitioner's guilt, just as the same court in *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), held that a defendant is entitled to have the trial judge first determine whether a confession was made voluntarily before handing it to the jury to assess its credibility, the proper rule here for those interested in fair trials but not perfect trials (*Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed.2d 593 (1953)) should be that "the substantial risk that a juror, despite assurances to the contrary, may have already decided upon the defendant's guilt from what he has read, from the mouth of the prosecutor himself and other law enforcement officers in a position to know, militates in favor of resolving the issue by a change of venue." This is, indeed, exactly where I differ from the majority, and where most legal minds will differ from the majority. Unlike *Bainbridge*, unlike *Needs*, unlike *Brooks*, unlike *Thomas*, unlike *Bitz*, unlike *Powers* (cited in the *Brooks* opinion), unlike *McLennan* (cited in the *Brooks* opinion), unlike any Idaho cases which I have reviewed, this is not a case

where "the pervasive influence of the free press in our daily lives" was at work by having ferreted out that which was reported—seemingly the situation in *Brooks.* This is a case where the free press was handed the prosecutor's statements which were reported. It is not a matter to be lightly glossed over—as the majority has done. The prosecutor's charge against the defendant was first degree murder. First degree murder is punishable by death. An essential element necessary of proof in this case on the charge of first degree murder was that the prosecution prove premeditation, and/or that it prove that the murder was committed during the perpetration of a felony, here the charged burglary. To prove premeditation was difficult, absent some direct evidence thereof. To connect the murder with the burglary was also a somewhat difficult proposition. That the defendant had killed Mr. Grammer was, however, a leadpipe cinch. The prosecutor did have the confession which he had reported having in talking to the media. It generally appears that the prosecutor had not misrepresented anything in his statements to the media. He did have the iron-clad murder case which he said he had. He was a man to be believed. But he did not necessarily have a first degree murder case. Hence, because he had been found credible, it is understandable that the jury would accept the truth in his final argument when he told them as to charge of felony murder:

> The reason that the defendant is guilty of murder while attempting to perpetrate this burglary is that the statute that defines first-degree murder states that when a person commits a crime of this gravity, that is, a burglary, that that crime, the crime of burglary, is so offensive to society that should death result to someone from the commission of that burglary, that by operation of law, he will be deemed or the intent of premeditation or deliberation will be inferred to the perpetrator of that crime. That's what we have here. We have the defendant perpetrating a burglary. We have a situation arising where the victim

of the burglary was killed, *and by operation of law, because of the crime of burglary is so offensive to society, that the law will infer that the defendant acted with premeditation and deliberation.*

> The law will also infer that the act of the defendant was malicious in attempting to perpetrate the burglary. He planned the crime, and that malicious act in perpetrating or attempting to perpetrate that crime is justly regarded as the causative antecedent of the homicide. Hence, *the person* is guilty of first-degree murder by operation of the law, because the requisite intent is referred. *It is imputed to him.* That is what that instruction is really all about, having to do with committing a burglary in the context or perpetration of a burglary.

> I submit to you that has been proven by the evidence beyond a reasonable doubt. Tr., Vol. 2, pp. 331–32 (emphasis added).

Likewise, the prosecutor's credibility should have convinced the jury when he explained how premeditation had been proven:

> Under the instructions that you have received, deliberate simply means the act was formed or arrived at or was determined as a result of a thought process. That he thought about it, then did it. The length of time he thought about it does not really matter that much. All of us are familiar with the way the thought process works. A thought process can go through your mind as quick as a snap of the fingers. Caveat is that it be a careful, deliberate thought. Premeditation. That is another word that is along with deliberate; premeditation simply means it occurred beforehand. What is the evidence that has been shown that indicates deliberation and premeditation?

> First of all, the crime was planned in advance. The crime was planned in advance. *I suppose we could say physically the killing itself may not have been planned in advance, but there is something in my mind that says it was at*

*least thought about.* But the burglary was planned in advance. It was thought about. One of the comments that the defendant made in his statement during that time they were thinking about this, "neither one of us wanted to hurt him, so we were going to tie him up." What does this tell you? What it tells me, at least, is that in this planning stage of this burglary, it had crossed the defendant's mind. "Well, something may come up and we might hurt this guy. We might do something to him." Their thought was in order to prevent that from happening, we'll tie him up. But it crossed their minds before they ever went in the house that something might happen to hurt the guy.

When they got there and they did accost Grammer, they did hurt him. You will remember when Dr. Donndelinger testified, and he testified to the injuries that Grammer had received. I am not sure which eye it was at this time, but there was a cut under the eye, and apparently that cut came after he had died, because there was no blood pressure or blood diffused out into the tissue.

The other side of the face, at about this location, as I recall, it is in the photograph and you can look at the photograph and see it, but somewhere in that location there was a rather severe bruise. That occurred prior to death. And more significantly, he testified that he had received a blow to the back of his head. That blow to the back of his head was of such nature or was severe enough as to likely cause unconsciousness.

Now, they hurt him, irregardless of the stab wounds. Then what did they do? They said they bound his hands with duct tape and his hands are bound in back with his wrists together.

Then they said they laid him down on the bed, and they bound his feet together with duct tape. Then I believe the third thing in sequence you will recall the testimony of Officer Appleton, wherein they went back over to the house on Sunday and had the defendants walk them through what happened.

The third thing they did was take the duct tape and place it around Grammer's face and attach it all the way around with the straps going clear around. Then they stabbed him.

Now, let's look at it from this argument. When the stabbing occurred, Grammer was incapacitated. He could not defend himself. He posed absolutely no threat to the safety or well being of the defendants. There was no way in that incapacitated state he could provoke the defendant in the legal sense to doing something other than what Fetterly was inclined to do of his own will. He was not provoked. Fetterly stabbed the guy because that was what he was inclined to do, and he did it.

He stated that Grammer began struggling; that he became unglued, or something to that effect. Why do you suppose Grammer became unglued. And going back through this sequence of events, the wrapping of the wrists, the wrapping of the feet, the wrapping of the face, you will recall the testimony of Dr. Donndelinger. That tape that was wrapped around the face was put on in such a way that it sealed off the air, the nose and mouth. The guy couldn't breathe. If he had not died of stab wounds, or the stab wound in the aorta, he would have died of asphyxiation. That is what Dr. Donndelinger said. If somebody taped your face with duct tape in the manner in which this defendant taped the face of Sterling Grammer, I think we would come unglued. At some point in time you would begin to thrash around. You would begin to struggle because you were not getting any air. You were not breathing at this point in time. They were trying to hold him down on the bed and keep him down on the bed. His head came up and knocked Mr. Fetterly's head, and they tried to hold him on the bed.

Then Mr. Fetterly said, "I reached across the headboard of the bed, grabbed the knife," already opened, they had opened the knife to cut the duct tape, he

grabbed the knife, and he started stabbing him in the chest.

Now, let's talk about this deliberation and premeditation for a moment. The guy is on the bed. He is struggling. The defendant can remember that he reached for the knife. He didn't reach for the knife with his left hand, but he reached for it with his right hand. He realized that the knife was already opened. Then he came back and began to stab the guy, in his words, "I stuck him." When you don't have the knife in your hand and the knife is located elsewhere, and the fact that you reach across and get the knife, put it in your hand, and stab with it, that involves the thought process. That involves deliberation. That involves premeditation. To get the weapon that you don't have in your hand, to obtain that weapon, then use that weapon to stab the guy with. I submit that the act of doing that involved deliberation. It involved premeditation. It involved malice aforethought. It involved a wanton disregard for the life of another person. Tr., Vol. 2, pp. 334–38 (emphasis added).

That the prosecutor was able to convince the jury of defendant's guilt as to premeditated first degree murder is not surprising. But he was not on sound ground in advising the jury that *the law infers premeditation,* and that it infers deliberation. Felony first degree murder is defined by I.C. § 18–4003(d), which states that with regard to the perpetration of, or attempt to perpetrate, certain felonies, and burglary is enumerated, any murder committed is murder of the first degree. Premeditation is not a required element in felony murder. Similarly, it is not an element where the person murdered is a peace officer, executive officer, officer of the court, fireman, judicial officer, or prosecuting attorney, § 18–4003(b), or where a convict murders a prison or jail employee, another inmate, or a visitor, or committed in attempting an escape. The conviction of premeditated first degree murder is highly suspect. The trial court's instructions on felony murder were correct, and the jury undoubtedly followed them. But the verdict on premeditated murder clearly became clouded by the prosecutor's incorrect statements.

All considered, I think that a new trial should be had, which would be predicated primarily on the prosecutor's trying of the case to the media in advance of trial. If there is a better way to prevent such future occurrences, I do not know of it. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Such a decision should emanate from, at best, a unanimous vote from this Court, and at the least, from a majority, which will not happen.

Accordingly, I concur in the Court's judgment affirming the jury verdicts. I do not concur in the trial court's judgment imposing the death penalty, not because it is not merited, but on the basis of my views heretofore expressed as to the unconstitutionality in failing to involve the jury in the capital sentencing process, which remain not only unchanged, but fortified.